John H. Carney
State Bar No. 03832200
Andrew G. Counts
State Bar No. 24036408
JOHN H. CARNEY & ASSOCIATES
One Meadow Building
5005 Greenville Avenue, Suite 200
Dallas, Texas 75206
(214) 368-8300 – Telephone
(214) 363-9979 – Facsimile

Jeff P. Prostok
State Bar No. 16352500
J. Robert Forshey
State Bar No. 07264200
Suzanne K. Rosen
State Bar No. 00798518
FORSHEY & PROSTOK, LLP
777 Main Street, Suite 1290
Fort Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151

ATTORNEYS FOR DEFENDANTS RUTHVEN OIL & GAS, LLC, WENDELL HOLLAND,
THE WENDELL AND KARI HOLLAND TRUST, AND CIANNA RESOURCES, INC.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re | Chapter 11 Case |
| PROVIDENT ROYALTIES, LLC, *et al.,* | Case No. 09-33886-hdh-11 |
| Debtors. | Jointly Administered |
| MILO H. SEGNER, JR., as Liquidating Trustee of the PR Liquidating Trust, | |
| Plaintiff, | Adversary No. 11-03385-hdh |
| v. | |
| RUTHVEN OIL & GAS, LLC, WENDELL HOLLAND, THE WENDELL AND KARI HOLLAND TRUST, and CIANNA RESOURCES, INC., | |
| Defendants. | |

## RUTHVEN OIL & GAS, LLC'S BRIEF IN SUPPORT OF RESPONSE TO
## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... iii

TABLE OF DEFINED TERMS ................................................................................... vii

I.      INTRODUCTION ...............................................................................................1

II.     SUMMARY JUDGMENT STANDARD ............................................................2

III.    ARGUMENT AND AUTHORITIES..................................................................3

        A.      THE SUMMARY JUDGMENT EVIDENCE DOES NOT ESTABLISH THE
                EXISTENCE OF A PONZI SCHEME ...........................................................3

                1.      There Is a Genuine Issue of Material Fact as to Whether the
                        Debtors Were Engaged in a Ponzi Scheme at the Time of the
                        Transfers ...............................................................................4

                        a.      The Debtors' Business Does Not Fit the Mold of a
                                Ponzi Scheme....................................................................7

                        b.      Plaintiff's Cash Flow Analysis Fails to Show That
                                the Debtors Were Dependent on Funds from New
                                Investors to Pay Dividends ..............................................14

                        c.      The Factual Statements Supporting the Guilty Pleas of
                                Melbye, Blimline, and the Other Alleged Co-Conspirators
                                Fail to Show that the Debtors Were Operating a Ponzi
                                Scheme at the Time of the Transfers ...............................15

                2.      Even Assuming *Arguendo* That the Debtors Were Operating
                        a Ponzi Scheme, the "Ponzi Scheme Presumption" Does
                        Not Apply Because the Transfers Were Not Made
                        *in Furtherance of* the Alleged Ponzi Scheme .............................19

        B.      PLAINTIFF IS NOT ENTITLED TO SUMMARY JUDGMENT ON
                RUTHVEN'S SECTION 548(c) DEFENSE...................................................22

                1.      Ruthven Acted in Good Faith With Respect to the Transfers ..................23

                        a.      The "Ponzi Scheme Presumption" Does Not Apply to
                                Ruthven's State of Mind ...............................................24

b.   The Arm's Length Nature of Ruthven's Engagement by the Debtors Shows That Ruthven Acted in Good Faith .................25

c.   Ruthven Had No Reason to Believe the Debtors' Business Was Not Legitimate and No Duty as a Trade Counterparty to Investigate ....................................................................................26

d.   The Trustee's Evidence Fails to Negate Ruthven's Good Faith ....28

(i)   Holland Was Not a Longstanding Blimline Associate ......28

(ii)   Ruthven Was Not Aware of Any Wrongdoing by Blimline at the Time of the Transfers ...............................29

(iii)   Neither Ruthven nor Mr. Holland Were Insiders of the Debtors ...........................................................................31

(iv)   There Were No "Warning Signs" That Put Ruthven on Inquiry Notice Regarding the Debtors' Business Operations ........................................................................32

(v)   Ruthven's Business Practices Do Not Call Its Good Faith into Question ..........................................................33

(vi)   Ruthven's Compensation Did Not Lopsidedly Favor Ruthven .............................................................................34

e.   The Cases Relied on by Plaintiff to Support His Good Faith Argument Are Factually Distinguishable ......................................35

2.   Ruthven Gave Reasonably Equivalent Value in Exchange for the Transfers .......37

a.   The Value Determination Must Be Evaluated from Ruthven's Perspective under Section 548(c) .....................................................37

b.   Plaintiff's Value Argument Incorrectly Focuses on the Value of the Mineral Properties and Not the Value of Ruthven's Brokerage Services ......................................................................39

c.   Ruthven Was a Third Party Vendor of Legitimate Brokerage Services and Not a Broker of Securities ........................................46

d.   Plaintiff's Cases on Value Are Both Inapposite ............................48

C.   SUMMARY JUDGMENT ON THE ISSUE OF DAMAGES IS INAPPROPRIATE ...............................49

# TABLE OF AUTHORITIES

## Federal Cases

*Allard v. Flamingo Hilton (In re Chomakos)*, 69 F.3d 769 (6th Cir. 1995) ...................................38

*Am. Cancer Soc'y v. Cook*, 675 F.3d 524 (5th Cir. 2012) .....................................................5, 6, 18

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...............................................................3

*Asarco LLC v. Ams. Mining Corp.*, 404 B.R. 150 (S.D. Tex. 2009) ....................................... 49-50

*Balaber-Strauss v. Lawrence*, 264 B.R. 303 (S.D.N.Y. 2001) .............................................4, 22, 46

*Balaber-Strauss v. Sixty-Five Brokers (In re Churchill Mortg. Inv. Corp.)*,
        256 B.R. 664 (Bankr. S.D.N.Y. 2000).......................................................4, 22, 41, 45, 47

*Bank of Am, N.A. v. Kapila (In re Pearlman)*, 478 B.R. 448 (M.D. Fla. 2012) ...........................19

*Bonded Financial Services, Inc. v. European American Bank*,
        838 F.2d 890 (7th Cir. 1980) ...........................................................................46

*Boyer v. Crown Stock Dist., Inc.*, 587 F.3d 787 (7th Cir. 2009)..............................................24, 38

*Brandt v. Am. Nat'l Bank & Trust Co. (In re Foos)*,
        188 B.R. 239 (Bankr. N.D. Ill. 1995) ...........................................................................4, 22

*Brown v. Third Nat'l Bank (In re Sherman)*, 67 F.3d 1348 (8th Cir. 1995) .................................23

*Butler Aviation Int'l, Inc. v. Whyte (In re Fairchild Aircraft Corp.)*,
        6 F.3d 1119 (5th Cir. 1993) ...........................................................................38

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...........................................................................3

*Clark v. Security Pac. Business Credit (In re Wes Dor, Inc.)*,
        996 F.2d 237 (10th Cir. 1993) ...........................................................................49

*Cuthill v. Greenmark, LLC (In re World Vision Entm't, Inc.)*,
        275 B.R. 641 (Bankr. M.D. Fla. 2002) .......................................................4, 24, 41, 47

*Daly v. Deptula (In re Carrozzella & Richardson)*, 286 B.R. 480 (D. Conn. 2002)....................41

*Dicello v Jenkins (In re Int'l Loan Network)*, 160 B.R. 1 (Bankr. D.D.C. 1993)....................45, 47

*Dillworth v. In re Best Prods., Co.*, 157 B.R. 222 (Bankr. S.D.N.Y. 1993)................................39

*First Commer. Mgmt. Group v. Reinhardt (In re First Commer. Mgmt. Group),*
    279 B.R. 230 (Bankr. N.D. Ill. 2002) ............................................................ 37, 39, 45-47

*Floyd v. Dunson (In re Rodriguez),* 209 B.R. 424 (S.D. Tex. 1997) ........................................5, 47

*Gold v. First Tenn. Bank, N.A. (In re Taneja),* 2012 Bankr. LEXIS 3554 (July 30, 2012) .......5, 18

*Hensley v. Boudloche,* 201 F.3d 638 (5th Cir. 2000) .....................................................................48

*Hirsch v. Steinberg (In re Colonial Realty Co.),* 226 B.R. 513 (Bankr. D. Conn. 1998) ........ 49-50

*Hirsh v. Cahill (In re Colonial Realty Co.),* 210 B.R. 921 (Bankr. D. Conn. 1997) ....24-25, 36-37

*Image Masters, Inc. v. Chase Home Finance,* 489 B.R. 375 (E.D. Pa. 2013) ..............................41

*Impossible Elecs. Techniques, Inc. v. Wackenhut Protective Sys., Inc.,*
    669 F.2d 1026 (5th Cir. 1982) ...............................................................................18

*In re Blackburn,* 90 B.R. 569 (Bankr. M.D. Ga. 1987) ................................................................49

*In re Brown,* 118 B.R. 57 (Bankr. N.D. Tex. 1990) ....................................................................49

*In re Centennial Textiles, Inc.,* 220 B.R. 165 (Bankr. S.D.N.Y. 1998) ......................................49

*In re Classic Drywall, Inc.,* 127 B.R. 874 (D. Kan. 1991) ..........................................................49

*In re Coutee,* 984 F.2d 138 (5th Cir. 1993) ................................................................................46

*In re Hydro Action,* 341 B.R. 186 (Bankr. E.D. Tex. 2006) ..........................................................3

*In re Manhattan Inv. Fund Ltd.,* 397 B.R. 1 (S.D.N.Y. 2007) ......................................................19

*In re Morris Comms. NC, Inc.,* 914 F.2d 458 (4th Cir. 1990) .....................................................38

*In re Petters Co.,* 495 B.R. 887 (Bankr. D. Minn. 2013) .........................................................4, 19

*In re Premiere Network Servs.,* 333 B.R. 126 (Bankr. N.D. Tex. 2005) ......................................31

*In re Sawran,* 359 B.R. 348 (Bankr. S.D. Fla. 2007) ..................................................................49

*In re Universal Clearing House Co.,* 60 B.R. 985 (D. Utah 1986) ...................................41, 45-47

*Janvey v. Alguire,* 647 F.3d 585 (5th Cir. 2011) ...........................................................................5

*Jimmy Swaggart Ministries v. Hayes (In re Hannover Corp.),*
    310 F.3d 796 (5th Cir. 2002) ....................................................................... *passim*

*Jobin v. Lalan (In re M&L Bus. Mach. Co.)*, 160 B.R. 851 (Bankr. D. Colo. 1993) ...................11

*Kapila v. Phillips Buick-Pontiac-GMC Truck, Inc. (In re ATM Fin. Servs., LLC)*,
    2011 Bankr. LEXIS 2394, (Bankr. M.D. Fla. June 24, 2011) .........................................19

*Kingsley v. Wetzel (In re Kingsley)*, 518 F.3d 874 (11th Cir. 2008)............................................49

*Liberatore v. 21st Century Satellite Comms., Inc. (In re 21st Century*
    *Satellite Comms., Inc.)*, 278 B.R. 577 (Bankr. M.D. Fla. 2002)........................... 38, 45-47

*Marshall Indep. Sch. Dist. v. U.S. Gypsum Co.*, 790 F. Supp. 1291 (E.D. Tex. 1992) ..................3

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).........................18, 23, 37

*Merrill v. Abbott (In re Indep. Clearing House Co.)*, 77 B.R. 843 (D. Utah 1987) ............... 23-24

*O'Chesky v. Horton (In re Am. Hous. Found.)*, 2011 Bankr. LEXIS 3837
    (Bankr. N.D. Tex. Sept. 30, 2011) ....................................................................... 23-24

*Perkins v. Haines*, 661 F.3d 623 (11th Cir. 2011) ........................................................................4

*Peterson v. Atradius Trade Credit Ins., Inc. (In re Lancelot Investors Fund, LP)*,
    451 B.R. 833 (Bankr. N.D. Ill. 2011) ......................................................................41

*Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995)................................................................11, 45

*SEC v. Management Solutions, Inc.*, Civil No. 2:11-CV-1165-BSJ,
    2013 U.S. Dist. LEXIS 120277 (D. Utah Aug. 22, 2013) ............................................5, 9

*Shape, Inc. v. Midwest Eng'g, Inc. (In re Shape, Inc.)*, 176 B.R. 1
    (Bankr. D. Maine 1994)...............................................................................................49

*Smith v. Woodforest Nat'l Bank (In re IFS Fin. Corp.)*, 2007 Bankr. LEXIS
    4708 (Bankr. S.D. Tex. May 3, 2007) ...........................................................................38

*Stoebner v. Ritchie Capital Mgmt., L.L.C. (In re Polaroid Corp.)*,
    472 B.R. 22 (Bankr. D. Minn. 2012) .............................................................................19

*Templeton v. O'Chesky (In re Am. Housing Found., Inc.)*,
    2014 U.S. Dist. LEXIS 51415 (N.D. Tex. Apr. 11, 2014)......................................... 22-25

*United States v. Diebold, Inc.*, 369 U.S. 654 (1962)................................................................18, 23

*Wagner v. Oliva (In re Vaughan Co.)*, 500 B.R. 778 (Bankr. D.N.M. 2013)..........................4, 19

*Warfield v. Byron*, 436 F.3d 551 (5th Cir. 2006)................................................. *passim*

*Welt v. Publix Super Markets, Inc. (In re Phoenix Diversified Inv. Corp.),*
    2011 Bankr. LEXIS 4100 (Bankr. S.D. Fla. June 2, 2011) ................. 19-20, 24, 37-38, 41

*Williams v. BBVA Compass Bank (In re Positive Health Mgmt.),*
    2012 U.S. Dist. LEXIS 127520 (S.D. Tex. Sept. 7, 2012) ............................ 22, 37-38, 41

**Federal Statutes**

11 U.S.C. § 544 ................................................................................................................ 19

11 U.S.C. § 548(a)(1)(A) ............................................................................................... 19

11 U.S.C. § 548(c) .............................................................. 22, 25, 37, 40-41, 47-48

11 U.S.C. § 548(d)(2)(A) ............................................................................................... 45

11 U.S.C. § 550 .............................................................................................. 3, 45, 49-50

11 U.S.C. § 550(a) ......................................................................................................... 49

**State Statutes**

Fla. Stat. § 726.105(1)(a) ............................................................................................. 19

Fla. Stat. § 726.108 ........................................................................................................ 19

**Secondary Sources**

5 COLLIER ON BANKRUPTCY ¶ 548.03[6] (16th Ed. 2014) ............................................ 39

5 COLLIER ON BANKRUPTCY ¶548.07 ............................................................................ 24

5 COLLIER ON BANKRUPTCY ¶548.07[2][a] ................................................................... 23

5 COLLIER ON BANKRUPTCY, § 548.09 (15th ed. 1984) ................................................ 38

BLACK'S LAW DICTIONARY 1198 (8th ed. 2004) ............................................................. 5

Standard & Poor's, Preferred Stock Primer (March 25, 2009) ..................................... 11

## TABLE OF DEFINED TERMS

1.    The term "Ruthven" refers to Ruthven Oil & Gas, LLC

2.    The term "Plaintiff" refers to Milo H. Segner, Jr., as the representative of the Debtors.

3.    The term "Debtors" refers to Provident Royalties, LLC, Provident Energy I, LP; Provident Resources I, LP; Shale Royalties II, Inc., Shale Royalties 3, LLC, Shale Royalties 4, Inc., Somerset Lease Holdings, Inc., Provident Operating Company LLC, Provident Energy 2, LP, Provident Energy 3, LP, Shale Royalties 5, Inc., Shale Royalties 6, Inc., Shale Royalties 7, Inc., Shale Royalties 8, Inc., Shale Royalties 9, Inc., Shale Royalties 10, Inc., Shale Royalties 12, Inc., Shale Royalties 14, Inc., Shale Royalties 15, Inc., Shale Royalties 16, Inc., Shale Royalties 17, Inc., Shale Royalties 18, Inc., Shale Royalties 19, Inc., Shale Royalties 20, Inc., Shale Royalties 21, Inc., Shale Royalties 22, Inc. and Somerset Development, Inc. which are administratively consolidated under Case No. 09-33886-hdh-11, in the U.S. Bankruptcy Court for Northern District of Texas, Dallas Division.

4.    The term "Cianna" refers to Cianna Resources, Inc.

5.    The term "Transfers" refers to $48,812,882.24 in alleged transfers to Ruthven by certain of the Debtors, and for which Plaintiff seeks recovery against Ruthven.

6.    The term "Blimline" refers to Joseph Blimline.

7.    The term "Melbye" refers to Russ Melbye.

8.    The term "Roossien" refers to Dennis Roossien.

9.    The term "Clark" refers to L. Ford Clark.

10.    The term "Sinclair" refers to Sinclair Oil & Gas Company.

11.    The term "PAM" refers to Provident's Broker Dealer Provident Asset Management.

12.    The term "PPM" refers to Private Placement Memorandum.

13.    The term "PRLLC" refers to Provident Royalties, LLC.

14.    The term "SR5" refers to the PPM for Share Royalties 5, Inc.

15.    The term "Harrison" refers to Henry Harrison.

16.    The term "Coughlin" refers to Brendan Coughlin.

17.    The term "Miller" refers to W. Mark Miller.

18.     The term "Phoenix" refers to Phoenix Petroleum Partners, LLC.

19.     The term "MPSA" refers to the Master Purchase and Sale Agreement.

20.     The term "Brokerage Agreements" refers to the MPSA and Broker Agreement.

TO THE HONORABLE HARLIN D. HALE, U.S. BANKRUPTCY JUDGE:

Comes now Defendant Ruthven Oil & Gas, LLC ("Ruthven") and files this Brief in Support of Ruthven's Response to the Motion for Partial Summary Judgment ("Motion") filed by Plaintiff Milo H. Segner, Jr. ("Plaintiff"), as the representative of the combined estates of the above-styled administratively consolidated debtors ("Debtors").

## I.  INTRODUCTION

1.      In his Motion, Plaintiff seeks to avoid and recover, as intentionally fraudulent, certain transfers (collectively, the "Transfers") made by certain of the Debtors to Ruthven totaling $48,812,882.24.  In so doing, Plaintiff ignores the actual facts, and the overwhelming evidence of legitimate business operations, and makes a number of inferential leaps that are not supported by the summary judgment record.  First, Plaintiff contends that the Debtors' were operating a Ponzi scheme.  In other words, Plaintiff asks this Court to find that the Debtors were essentially a pyramid scheme whose sole business purpose was to manufacture returns using later investor funds in an effort to lure additional investors into the scheme.  However, Plaintiff completely ignores the fact that the Debtors made more than $470 million in oil and gas mineral purchases, leases, well elections and related oil and gas acquisitions, participated in approximately 600 successful wells, partnered with Sinclair Oil & Gas Company, one of the largest and most respected companies in the United States, in acquiring approximately 290,000 acres of mineral interests, engaged skilled professionals in an effort to comply with securities laws, and did not depend on the investment of subsequent investor funds for the payment of dividends.  Thus, because the Debtors' business was not a Ponzi scheme, Plaintiff cannot rely on the so-called "Ponzi scheme presumption" to prove the Transfers were made with actual intent to

hinder, delay or defraud.

    2.      Second, the Ponzi scheme presumption would not apply here in any event because Plaintiff does not assert, nor could he establish, that the Transfers were made in furtherance of an alleged Ponzi scheme. Instead, the undisputed evidence shows that the Transfers were made by the Debtors (i) in ordinary business transactions to acquire mineral properties pursuant to their stated business plan, and (ii) to pay commercially reasonable commissions to Ruthven in exchange for its brokerage services provided in connection therewith.

    3.      Finally, Plaintiff wholly fails to negate Ruthven's affirmative defense that it acted in good faith and gave value in exchange for the Transfers. Ruthven was a legitimate third party vendor providing brokerage services to the Debtors in exchange for usual and customary compensation negotiated in arm's length transactions. The Debtors' acquisition of mineral properties was made in specific geographic areas selected by the Debtors, based on the Debtors' due diligence conducted by their in-house team of oil and gas professionals, outside consultants, and Sinclair's geologists and petroleum engineers. The lease and mineral purchases were made on the terms, conditions, and price specified by the Debtors. Further, the summary judgment record establishes that Ruthven acted in good faith and did not know, and indeed had no reason to suspect, that there was anything allegedly fraudulent about either the Debtors' business generally or the Transfers specifically. Finally, Ruthven gave reasonably equivalent value to the Debtors in the form of brokerage services rendered in exchange for the commissions it received.

## II.  SUMMARY JUDGMENT STANDARD

    4.      Summary judgment is appropriate only where the summary judgment evidence, when viewed in the light most favorable to the nonmoving party, show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of

law."[1]  A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury

could return a verdict for the nonmoving party.[2]  In making its determination, the court must

draw all justifiable inferences in favor of the nonmoving party.[3]  Moreover, where a party moves

for summary judgment on the grounds that the non-moving party has no evidence in support of

an essential element of a claim or defense upon which the non-moving party has the burden of

proof, the party moving for summary judgment bears the initial burden of showing that the non-

movant's evidence is wholly lacking.[4]

5.      Plaintiff has failed to satisfy this burden here.  Instead, genuine issues of material

fact exist with respect to: (1) whether the Debtors' business was a Ponzi scheme; (2) if the

Debtors' business was a Ponzi scheme, whether the Transfers were made in furtherance thereof;

(3) whether Ruthven acted in good faith and gave value in exchange for the Transfers; and, (4)

assuming *arguendo* that the Transfers are avoidable, the amount, if any, the Plaintiff is entitled to

recover from Ruthven under section 550.

### III. ARGUMENT AND AUTHORITIES

#### A.   THE SUMMARY JUDGMENT EVIDENCE DOES NOT ESTABLISH THE EXISTENCE OF A PONZI SCHEME

6.      In his Brief, the Plaintiff contends that, because the Debtors were allegedly

operating a Ponzi scheme, the Transfers to Ruthven were made with actual intent to hinder,

---

[1] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (internal quotations omitted).

[2] *Id.* at 248.

[3] *Id.* at 255.

[4] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *In re Hydro Action*, 341 B.R. 186, 193 (Bankr. E.D. Tex. 2006) ("While federal law clearly contemplates summary judgment in circumstances where there is truly no evidence of an essential element, the party moving for summary judgment must make some showing that evidence on an essential point is wholly lacking." (internal citation omitted)); *Marshall Indep. Sch. Dist. v. U.S. Gypsum Co.*, 790 F. Supp. 1291, 1299-1300 (E.D. Tex. 1992) ("Even where the non-moving party has the burden of persuasion on an issue, the summary judgment movant still has the initial burden of showing the absence of a genuine issue of material fact. It is not enough to move for summary judgment without supporting the motion in any way or with a conclusory assertion that the plaintiff has no evidence to prove its case.").

delay, or defraud the Debtors' creditors.[5] Plaintiff's position, simply stated, is that the Debtors

were engaged in a Ponzi scheme and, *ipso facto*, the Transfers were made with fraudulent intent.

     7.     Courts have routinely rejected the notion that all payments from a Ponzi scheme,

regardless of their nature, are subject to avoidance.[6] Instead, even where the existence of a Ponzi

scheme has been established, courts will only presume that transfers made by the debtor ***in***

***furtherance of*** the scheme (typically dividends made to early investors for the purpose of

attracting new investors) were made with actual intent to hinder, delay, or defraud creditors.[7]

This is so because, where a debtor operating a Ponzi scheme also conducts ordinary business

operations outside of the Ponzi scheme, the basis for presuming fraud is not present.[8] Thus, in

order to prove fraudulent intent for summary judgment purposes based upon the "Ponzi scheme

presumption," Plaintiff must prove (i) that the Debtors, in fact, were operating a Ponzi scheme at

the time of the Transfers, and (ii) that the Transfers to Ruthven were *in furtherance of* such

scheme.[9] Here, Plaintiff has proven neither.

     **1.**     **There Is a Genuine Issue of Material Fact as to Whether the Debtors Were
Engaged in a Ponzi Scheme at the Time of the Transfers**

     8.     A Ponzi scheme is a "fraudulent investment scheme in which money contributed

---

[5] See Plaintiff's Brief, pp. 16-18.

[6] *Cuthill v. Greenmark, LLC (In re World Vision Entm't, Inc.),* 275 B.R. 641, 658 (Bankr. M.D. Fla. 2002) ("Simply
because a debtor conducts its business fraudulently does not make every single payment by the debtor subject to
avoidance."); *Balaber-Strauss v. Sixty-Five Brokers (In re Churchill Mortg. Inv. Corp.),* 256 B.R. 664, 676 (Bankr.
S.D.N.Y. 2000) ("The fact that the debtor's enterprise as a totality is operated at a loss, or in a manner that it
fraudulent, does not render actually or constructively fraudulent a particular transaction which in and of itself is not
fraudulent in any respect."), *aff'd sub nom. Balaber-Strauss v. Lawrence,* 264 B.R. 303 (S.D.N.Y. 2001).

[7] *See, e.g., Warfield v. Byron,* 436 F.3d 551, 558 (5th Cir. 2006); *Perkins v. Haines,* 661 F.3d 623, 626 (11th Cir.
2011).

[8] *Brandt v. Am. Nat'l Bank & Trust Co. (In re Foos),* 188 B.R. 239, 244 (Bankr. N.D. Ill. 1995), *rev'd on other
grounds,* No. 96C3982, 1996 U.S. Dist. LEXIS 14507, 1996 WL 563503 (N.D. Ill. Sep. 23, 1996) (holding that the
basis of presuming fraud is not present where a Ponzi scheme operator conducts ordinary business transactions
outside of the scheme).

[9] *See, e.g., In re Petters Co.,* 495 B.R. 887, 907 (Bankr. D. Minn. 2013); *Wagner v. Oliva (In re Vaughan Co.),* 500
B.R. 778, 789-790 (Bankr. D.N.M. 2013).

by later investors generates artificially high dividends or returns for the original investors, whose example attracts even larger investments."[10]  Further, while all Ponzi schemes are frauds, "[n]ot all securities frauds are Ponzi schemes."[11]  Thus, to prove the existence of a Ponzi scheme, Plaintiff must show that returns to investors could not be paid by the underlying business venture.[12]  Further, in addition to the payment of dividends with funds from later investors, Ponzi schemes typically involve several other key characteristics, such as: (1) the promise of large returns; (2) the promise of returns with little to no risk; (3) the promise of consistent returns; (4) the delivery of promised returns to earlier investors to attract new investors; (5) the general insolvency of the investment scheme from the beginning; (6) the secrecy, exclusivity, and/or complexity; and (7) instability.[13]

9.    In sum, what distinguishes a Ponzi scheme from other forms of fraudulent investment schemes is that the Ponzi scheme's real business is bringing additional investors into the scheme.  Here, however, it is undisputed that the Debtors followed a defined business plan described in their securities offering materials, acquired substantial assets, and built legitimate business operations.  Further, the Debtors had numerous sources of funds available to pay dividends and redemptions, including significant revenues from operations, loan proceeds, capital surplus and reimbursement from the Sinclair transactions, generating significant revenues.  As the Fifth Circuit has recognized, while all Ponzi schemes are frauds, "[n]ot all

---

[10] *Am. Cancer Soc'y v. Cook*, 675 F.3d 524, 527 (5th Cir. 2012) (quoting *Janvey v. Alguire*, 647 F.3d 585, 597 (5th Cir. 2011) (in turn quoting BLACK'S LAW DICTIONARY 1198 (8th ed. 2004))).

[11] *Am. Cancer Soc'y*, 675 F.3d at 526; *see also, e.g., Gold v. First Tenn. Bank, N.A. (In re Taneja)*, 2012 Bankr. LEXIS 3554, *27 (July 30, 2012) (same).

[12] *SEC v. Management Solutions, Inc.*, 2013 U.S. Dist. LEXIS 120277, *66 (D. Utah Aug. 22, 2013).

[13] *Id.* at *67 (citing cases); *see also Floyd v. Dunson (In re Rodriguez)*, 209 B.R. 424, 430-31 (Bankr. S.D. Tex. 1997) (discussing characteristics of a Ponzi scheme).

securities frauds are Ponzi schemes".[14] Consequently, at a minimum, there is an issue of

material fact regarding whether the Debtors were in fact a Ponzi scheme.

      10.     Plaintiff relies on the following largely irrelevant and erroneous evidence, none of

which could have been known to Ruthven, in an attempt to prove that the Debtors operated a

Ponzi scheme at the time of the Transfers between June 23, 2007 and December 1, 2008:

      a.     The plea agreement of Joseph Blimline ("Blimline") entered on June 21, 2010 relating to conduct in Michigan between November 2003 and March 2007 involving entities unrelated to the Debtors;[15]

      b.     The plea agreements entered in September 2009 by Eric Merkle and Jay Merkle, neither of whom had any affiliation with the Debtors, relating to conduct by the Merkles in Michigan from 2003 to 2007 involving entities unrelated to the Debtors;[16]

      c.     The plea agreements entered in September 2008, March 2009, and July 2010, by others in Michigan, none of whom had any affiliation with the Debtors, related to wrongdoing in Michigan between 2004-2006 involving entities unrelated to the Debtors;[17]

      d.     The factual statements made by Blimline in July 2010 and Russ Melbye ("Melbye") in June 2012 in connection with their guilty pleas involving conduct related to the Debtors, which generally admit making materially false statements and omissions to investors but do not admit or allege that the Debtors were engaged in a Ponzi scheme or that the Debtors were not engaged in a legitimate business;[18]

      e.     The factual statements made by other employees of the Debtors in February 2013 which admit making materially false statements to investors in January and February 2009, after the Transfers sought to be avoided, but likewise do not admit or allege that the Debtors were engaged in a Ponzi scheme or that the Debtors were not engaged in a legitimate business;[19] and,

      f.     A faulty cash flow analysis performed by Dennis Roossien ("Roossien"), the former receiver for the Debtors and plan trustee under the Debtors' confirmed plan, that completely ignores several sources of funds, aside from subsequent investor funds, that were available to pay dividends.[20] Of particular significance are two disputed facts: 1) Roossien's

---

[14] *American Cancer Soc'y*, 675 F.3d at 526.

[15] Plaintiff's Appx. 190-202.

[16] Plaintiff's Appx. 390-432.

[17] Plaintiff's Appx. 432-471.

[18] Plaintiff's Appx. 203-206; 472-477.

[19] Plaintiff's Appx. 478-486.

[20] Plaintiff's Appx. 45-82; see also, Declaration of Dennis Jackson, ¶¶ 9-14 (Def. Appx. 4-7); Expert Report of

contention that only "earnings and profits" could be used to pay dividends, and 2) that the Debtors were insolvent from inception based upon a balance sheet analysis wherein he concludes that the preferred stock issued by Provident should be characterized as debt rather than equity.

As set forth below, Plaintiff's summary judgment evidence fails to establish that the Debtors were engaged in a Ponzi scheme at the time each of the Transfers was made.

### a.    The Debtors' Business Does Not Fit the Mold of a Ponzi Scheme

11.    Because he cannot show that the Transfers were made with actual fraudulent intent, Plaintiff desperately attempts to portray the Debtors' business as a Ponzi scheme in an effort to take advantage of the "Ponzi scheme presumption." However, the Debtors' business enterprise simply does not fit the mold of a Ponzi scheme. As evidenced by the following facts, the Debtors operated a legitimate business, not a Ponzi scheme:

a.    The Debtors were not dependent upon funds from future investors to pay dividends.[21]

b.    The Debtors invested more than $470 million in property acquisitions.[22]

c.    The Debtors compiled a substantial portfolio of both producing and non-producing oil and gas properties—indeed, at one point independent experts believed that just a portion of the Debtors' oil and gas properties had a present net value of $420 million and would produce a total future net income of $1.8 billion.[23]

d.    The Debtors partnered with Sinclair Oil & Gas Company ("Sinclair") in acquiring approximately 290,000 acres of mineral interests and leases with a focus in the Arkoma Basin in Oklahoma (which is one of the most developed shale oil and gas basins in the entire state and the country), thus demonstrating that, when Sinclair was shown the substantial assemblage of strategically placed assets owned by the Debtors, it wanted to acquire half of the Debtors' existing Arkoma portfolio and proposed to together acquire more.[24]

---

Dennis Jackson dated Nov. 15, 2013, ¶¶ 32-33, as amended on March 11, 2014, ¶ 4 (the "Jackson Report") (Def. Appx. 27-29; 101).

[21] *Id.*

[22] Jackson Declaration, ¶ 19 (Def. Appx. 9-10); Jackson Report, ¶ 39 (Def. Appx. 31); Declaration of Mark Miller, ¶ 10 (Def. Appx. 255).

[23] Declaration of H.R. Smith, ¶¶ 12, 18 (Def. Appx. 1335, 1337); Miller Declaration, ¶ 10 (Def. Appx. 255).

[24] Jackson Declaration, ¶ 12 (Def. Appx. 6-7); Smith Declaration, ¶ 11 (Def. Appx. 1335); Miller Declaration ¶ 3 (Def. Appx. 252); *see also,* Plaintiff's Appx. 901-08.

e.    Provident's Broker Dealer Provident Asset Management ("PAM") sold only to accredited investors who were also required to satisfy a suitability standard.  This fact alone distinguishes the Debtors from Ponzi schemes, where money is indiscriminately accepted. Each Private Placement Memorandum ("PPM") sent to prospective investors clearly and explicitly warned that the purchase of preferred stock in the Debtors was a high-risk investment and that only those persons who have the financial ability and willingness to accept such risk should consider investing in the Debtors.[25]

f.    The October 2008 FINRA audit of PAM was virtually spotless.[26]  The Final Audit Report was concluded in December and dated 12/31/2008.[27]

g.    Not one single employee of the Debtors (and the Debtors had over 60 employees) has ever said that they believed that the Debtors ever operated a Ponzi scheme; instead, the Debtors operated a legitimate business enterprise focused on implementing the business plan as described in the PPMs and other marketing materials sent to investors.[28]

h.    The Debtors had dozens of highly qualified professionals on staff with expertise in accounting, finance, development, and marketing.[29]

i.    Provident retained and regularly consulted with highly skilled attorneys as part of its efforts to comply with applicable securities laws.[30]

j.    Provident voluntarily brought in highly qualified consultants to evaluate its operation/business plan, controls, and financials, and to assist in the sale of assets.[31]

k.    Provident had its own experienced compliance department monitoring the selling activities of independent broker dealers.[32]

l.    Provident Royalties, LLC ("PRLLC") drilled and/or participated in approximately 600 successful wells.[33]

12.    The single fact that the Debtors were not dependent on funds from new investors

to pay dividends to prior investors destroys the Trustee's theory that the Debtors' business

---

[25] Plaintiff's Appx. 701-728; see also, Def. Appx. 1349-1376.

[26] Declaration of Loretta Ponce, p. 2 (Def. Appx. 1347); Declaration of Debbie LaPrade, p. 1 (Def. Appx. 1340).

[27] Def. Appx. 2850-54.

[28] Smith Declaration, ¶¶ 4-6 (Def. Appx. 1332-34); Declaration of Dennis Palmer, ¶¶ 2-3 (Def. Appx. 1343).

[29] Smith Declaration, ¶¶ 4-6, 9 (Def. Appx. 1332-34).

[30] Smith Declaration, ¶¶ 10 (Def. Appx. 1334-35).

[31] Smith Declaration, ¶¶ 7, 10 (Def. Appx. 1334-35).

[32] Ponce Declaration, p. 1-2 (Def. Appx. 1346-47).

[33] Jackson Declaration, ¶ 14 (Def. Appx. 7); Smith Declaration, ¶ 12 (Def. Appx. 1335); Palmer Declaration, ¶ 6 (Def. Appx. 1344); Declaration of Mark Miller, ¶ 13 (Def. Appx. 259).

enterprise was a Ponzi scheme.[34]  As explained in the expert report of Daniel Jackson, CPA,

CFE, the Debtors as a whole received funds from non-investor sources well in excess of the

amounts expended in investor payments in 2007 and 2008.[35]  This is true even excluding the

proceeds of the $150 million loan that the Debtors received from Frost Bank, which had express

provisions allowing $30 million to be used to pay dividends and redemptions.[36]  Of the more

than $750 million available sources of funds entrusted to Provident by the investors, Sinclair, and

Frost Bank, less than 5% was paid in total dividends and redemptions.  Specifically, in 2007, the

Debtors had total non-investor receipts of $23,207,102 and made only $3,310,857 in investor

payments.[37]  In 2008, the Debtors had total non-investor receipts of $148,194,402 and made only

$33,207,741 in investor payments.[38]  Thus, the Debtors clearly were not dependent upon new

investments to pay dividends to their existing investors during 2007 and 2008 and, thus, were not

operating a Ponzi scheme at the time of the Transfers.

    13.    Furthermore, the Debtors' business enterprise bore none of the other hallmarks of

a typical Ponzi scheme, which include: (1) the promise of large returns; (2) the promise of

returns with little to no risk; (3) the promise of consistent returns; (4) the delivery of promised

returns to earlier investors to attract new investors; (5) the general insolvency of the investment

scheme from the beginning; (6) the secrecy, exclusivity, and/or complexity of the investment

scheme; and (7) the general instability of the investment scheme.[39]  As shown below, few, if any,

---

[34] *See SEC v. Management Solutions, Inc.*, 2013 U.S. Dist. LEXIS 120277, at *67 ("[I]f an investment scheme generates sufficient funds from legitimate sources to pay investors, it is unlikely that the scheme is a fraudulent Ponzi scheme.").

[35] Jackson Declaration, ¶¶ 9-14 (Def. Appx. 4-7); Jackson Report, ¶¶ 26-35 ( Def. Appx. 26-30).

[36] Jackson Declaration, ¶¶ 9-14 (Def. Appx. 4-7); Jackson Report, ¶¶ 26-35 ( Def. Appx. 26-30); see also, Loan Agreement (Def. Appx. 213-49).

[37] Jackson Declaration, ¶¶ 9-14 (Def. Appx. 4-7); Jackson Report, ¶¶ 26-35 ( Def. Appx. 26-30).

[38] Jackson Declaration, ¶¶ 9-14 (Def. Appx. 4-7); Jackson Report, ¶¶ 26-35 ( Def. Appx. 26-30).

[39] *Id.* at *67 (citing cases).

of these factors were present in the Debtors' business operation.

       a.      <u>Factors (1), (2), and (3): The Promise of High, Consistent Returns with</u>

<u>Little or No Risk.</u>  Unlike a typical Ponzi scheme, the Debtors did not promise investors high,

consistent returns with little or no risk.  To the contrary, the Debtors warned potential investors

of the high-risk nature of the investment opportunity and cautioned that dividends might not be

paid at all.  For example, the first page of the PPM for Share Royalties 5, Inc. ("SR5") contains

the following notice in bold font and all caps:

> **AN INVESTMENT IN THE PREFERRED STOCK INVOLVES A HIGH DEGREE OF RISK.  ONLY THOSE PERSONS WHO HAVE THE FINANCIAL ABILITY AND WILLINGNESS TO ACCEPT SUCH RISK SHOULD CONSIDER INVESTING IN THE PREFERRED STOCK. SEE "RISK FACTORS."[40]**

In addition, the "Risk Factors" section of the "Summary of the Offering" section of the PPMs

provides as follows:

> An investment in the Preferred Stock is suitable only if the investment would not constitute a significant portion of your investment portfolio and you can afford the loss of part or all of your investment.  See "Suitability Requirements."  An investment in the Preferred Stock involves a significant degree of risk.  See "Risk Factors."[41]

In fact, only "accredited investors" were even eligible to purchase preferred stock in the

Debtors.[42]  For an individual person to qualify as an "accredited investor," they would have to

have a net worth exceeding $1,000,000 or an income in excess of $200,000 per year or a joint

income together with their spouse in excess of $300,000 per year.[43]

       Moreover, the dividends the Debtors offered to investors, which ranged between

---

[40] Plaint. Appx. p. 702; Def. Appx. 1350.

[41] Plaint. Appx. p. 707; Def. Appx. 1355.

[42] Plaint. Appx. p. 720; Def. Appx. 1368.

[43] Plaint. Appx. p. 720; Def. Appx. 1368.

1.167 percent and 1.5 percent per month (i.e., 14 percent to 18 percent per annum),[44] were not

"promised" as they were expressly made contingent on operations, discretionary, and not assured

of consistent payment. The returns were not excessive, particularly in light of the high-risk

nature of the investment. Investment in the preferred stock carried even more risk than an

unsecured loan given that the PPMs expressly provide that the preferred stock is subordinate to

the Debtors' unsecured debt.[45] Thus, given the risk involved, the returns offered to investors in

the Debtors' preferred stock were not particularly high and could be readily achieved until the

unanticipated and unprecedented drop in natural gas prices. Indeed, as of February 27, 2009—

approximately one month after the Debtors stopped soliciting new investors—the S&P U.S.

Preferred Stock Index had an average yield of 16.1%, which is in line with the returns the

Debtors offered investors.[46] In sum, the dividends promised by the Debtors were reasonable and

did not approach the exorbitant returns often associated with Ponzi schemes.[47]

Furthermore, the PPMs never promised consistent returns and, indeed, the "Risk

Factors" section of the PPMs clearly warned potential investors that dividends might not be paid

at all:

> **No Assurance of Cash Flow or Payment.** The Corporation is a
> start-up enterprise that will have a cash flow dependent upon the
> receipt of the Corporation of payments or distributions from the
> Properties and other Oil and Gas Investments. No other person or
> entity will be responsible for payment of dividends on or the
> Redemption Price of the Preferred Stock. While the Corporation
> believes that the Corporation will have adequate cash flow to make
> timely payments on the Preferred Stock, there can be no assurance

---

[44] Plaint. Appx. p. 702-706; Def. Appx. 1350, 1354.

[45] Plaint. Appx. p. 717; Def. Appx. 1365.

[46] Standard & Poor's, Preferred Stock Primer (March 25, 2009) (Def. Appx. 1377).

[47] *Compare, e.g., Scholes v. Lehmann*, 56 F.3d 750, 752 (7th Cir. 1995) (Ponzi scheme promised investors 10 to 20 percent return per month on their investment); *Jobin v. Lalan (In re M&L Bus. Mach. Co.)*, 160 B.R. 851, 858 (Bankr. D. Colo. 1993) (Ponzi scheme promised investor annualized profits of 125 percent to 512 percent on a supposedly risk-free investment).

that the Corporation will have sufficient cash flow or other
resources to make timely payments of dividends on, and the
Redemption Price of, the Preferred Stock.[48]

Similar warnings appear throughout the "Risk Factor" section of the PPMs.  For example, page

12 of the SR5 PPM expressly states that "[t]here is no guarantee that the dividends on the

Preferred Stock will be timely paid or paid at all, or that the Redemption Price of the Preferred

Stock will be paid."[49]  Thus, it is evident from the PPMs that the Debtors did not promise

prospective investors high, consistent returns with little risk.

      b.      Factor (4): The Delivery of Promised Returns to Earlier Investors to

Attract New Investors. While the Debtors consistently made payments to investors, this, in and

of itself, is not indicative of a Ponzi scheme.  As shown above, the Debtors had sufficient

resources to pay dividends, so it stands to reason that they would pay them.  Moreover, rather

than continuing to pay dividends to attract new investors, the Debtors stopped paying dividends

and soliciting new investors during the third week of January 2009 following the unanticipated

and unprecedented drop in natural gas prices that was caused by the global financial crisis.

      c.      Factor (5): The General Insolvency of the Investment Scheme from the

Beginning. Unlike a typical Ponzi scheme, the Debtors invested more than $470 million in cost

basis property acquisitions.[50]  Specifically, the Debtors bought real oil and gas assets, acquiring

approximately 290,000 acres of mineral interests and leases, with a focus in the Arkoma and

Anadarko Basins in Oklahoma.[51]  The Debtors also drilled or participated in approximately

---

[48] Plaint. Appx. p. 714; Def. Appx. 1362.

[49] Plaint. Appx. p. 717; Def. Appx. 1365.

[50] Jackson Declaration, ¶ 12 (Def. Appx. 6-7); Jackson Report, ¶ 39 (Def. Appx. 31); Miller Declaration, ¶ 10 (Def. Appx. 255).

[51] Jackson Declaration, ¶ 12 (Def. Appx. 6-7); Smith Declaration, ¶ 11 (Def. Appx. 1335).

1,000 successful wells.[52] The Debtors compiled a substantial portfolio of both producing and

non-producing oil and gas properties. Indeed, when Sinclair was shown the substantial

assemblage of valuable, strategically placed assets owned by the Debtors, it wanted to acquire

half of the Debtors' existing portfolio and together acquire more.[53] Thus, unlike a Ponzi scheme,

in which investor funds are not used to acquire assets but rather to pay dividends to previous

investors, the Debtors acquired valuable oil and gas assets consistent with the business plan

stated in the PPMs. Further, aside from his Ponzi scheme allegation, the Plaintiff has made no

suggestion that the Debtors here were actually insolvent at the time of the Transfers.

    d.    Factor (6): The Secrecy, Exclusivity, and/or Complexity of the Investment
Scheme. The Debtors' business was not secretive, exclusive, or complex. Indeed, the Debtors

voluntarily engaged numerous independent third parties to assist them in their business plan,

ensure proper controls were in place, ensure transparency, and better manage their business.[54]

Further, while only "accredited investors" were allowed to invest in the preferred stock, this was

done in compliance with Section 4(2) of the Securities Act and Regulation D promulgated

thereunder. Limiting the preferred stock offerings to "accredited investors" was important to

ensure that all investors had the financial ability to accept such risk. Finally, the Debtors'

business plan, as stated in the PPMs, was straightforward: the Debtors intended to acquire and

develop oil and gas assets and then use the revenues from the development and resale of these

assets to pay dividends to investors.

    e.    Factor (7): The General Stability of the Investment Scheme. As noted
above, unlike a typical Ponzi scheme that has no real assets or business operations, the Debtors

---

[52] Jackson Declaration, ¶ 14 (Def. Appx. 7); Smith Declaration, ¶ 12 (Def. Appx. 1335); Palmer Declaration, ¶ 6 (Def. Appx. 1344).

[53] Jackson Declaration, ¶ 12 (Def. Appx. 6-7); Smith Declaration, ¶ 11 (Def. Appx. 1335).

[54] Miller Declaration, ¶ 10 (Def. Appx. 1334-35).

had a sound business plan to acquire oil and gas assets, retained high quality managerial staff and outside professionals to assist in the implementation of the business plan, and implemented the business plan as disclosed to investors. Although the Debtors' business involved certain risks, such risks were inherent in any start-up enterprise, particularly in the oil and gas industry. The stability of the Debtors' business was further bolstered by their partnership with Sinclair. The Debtors' bankruptcy filing was not the result of any intrinsic instability in the Debtors' business model but, rather, was primarily caused by the precipitous and unprecedented decline in gas prices brought about by the 2008 global financial crisis and the resulting demise of the credit markets, which neither the Debtors nor the U.S. financial community could have reasonably anticipated.

14.    In sum, the evidence clearly shows that the Debtors' business enterprise was not a Ponzi scheme. At a minimum, a genuine issue of material fact exists on this issue.

**b.    Plaintiff's Cash Flow Analysis Fails to Show That the Debtors Were Dependent on Funds from New Investors to Pay Dividends**

15.    To prove the Debtors were operating a Ponzi scheme, the Plaintiff relies on Roossien's cash flow analysis in which he attempts to portray the Debtors as dependent upon new investor funds to pay dividends to prior investors. He does this by comparing the amount paid in dividends by certain of the Debtors solely with the amount of their "revenue receipts" and completely ignoring the other sources of funds available to the Debtors to pay dividends. In total, the Debtors paid approximately $37 million in dividends and redemptions to their preferred shareholders.[55] The Debtors received approximately $30 million in Frost loan proceeds, $215 million in reimbursements from Sinclair, $10 million in revenues, and $10 million in well election refunds plus capital surplus, all of which were available to pay dividends. Indeed, even

---

[55] Jackson Declaration, ¶ 11 (Def. Appx. 6); Jackson Report, ¶ 32 (Def. Appx. 27-29, 101).

excluding the Frost Loan funds that were also available to pay dividends, the Debtors took in

funds from non-investor sources well in excess of the dividends paid to investors.[56]  Specifically,

in 2007 the Debtors had total non-investor receipts of $23,207,102 and made investor payments

of only $3,310,857.[57]  In 2008, the Debtors had total non-investor receipts of $148,194,402 and

made investor payments of only $33,207,741.[58]  Thus, the Debtors received more than sufficient

funds from non-investor sources to cover any dividend or return of capital payments made to

investors.  In sum, because the cash flow analysis upon which he relies is flawed, Plaintiff has

failed to demonstrate that the Debtors were dependent upon funds from new investors to pay

dividends.

> c.    **The Factual Statements Supporting the Guilty Pleas of Melbye, Blimline, and the Other Alleged Co-Conspirators Fail to Show that the Debtors Were Operating a Ponzi Scheme at the Time of the Transfers**

16.    Plaintiff primarily relies on the factual statements submitted by Melbye and

Blimline, and to a lesser extent those of Henry Harrison ("Harrison"), Brendan Coughlin

("Coughlin"), and W. Mark Miller ("Miller"), in an attempt to prove that the Debtors were

operating a Ponzi scheme at the time of the Transfers.  However, these factual statements, even if

admissible, fail to demonstrate that the Debtors were operating a Ponzi scheme at the time the

Transfers took place.

17.    As an initial matter, the factual statements of Harrison, Coughlin, and Miller are

irrelevant to the issue of whether the Debtors were operating a Ponzi scheme at the time the

Transfers occurred.  Indeed, these factual statements are limited to activities that occurred

---

[56] Jackson Declaration, ¶¶ 9-14 (Def. Appx. 4-7); Jackson Report, ¶ 32 (Def. Appx. 27-29, 101).
[57] *Id.*
[58] *Id.*

between January 1, 2009, and February 3, 2009,[59] i.e., *after* the Transfers between June 26, 2007 and December 1, 2008 sought to be avoided.[60] In addition, these factual statements only address false representations included in investor materials pertaining to Shale Royalties 20, Inc., Shale Royalties, 21, Inc., and Shale Royalties 22, Inc.,[61] none of which even made any of the disputed Transfers.[62] Accordingly, the factual statements of Harrison, Coughlin, and Miller provide no evidence on the issue of whether the transferor Debtors were involved in a Ponzi scheme at the time of the Transfers.

18.    Plaintiff also seeks to use the factual statements supporting the guilty pleas of Blimline and Melbye in an attempt to impute Blimline's misdeeds to the Debtors. In the Brief, Plaintiff refers to Blimline and Melbye as "the two most powerful individuals in Provident;" however, Blimline was never an officer, director, or shareholder of PRLLC, nor was he considered by the Debtors' other management to be an equal with Melbye, Coughlin, or Harrison.[63] Although Blimline allegedly had a secret verbal agreement with Melbye, there is no evidence that the Debtors' other officers and directors had any knowledge of it prior to the Debtors' bankruptcy filing.[64] Thus, while Blimline may have been a bad guy who had a secret deal with Melbye, there is no basis for imputing Blimline's misdeeds to the Debtors' entire business enterprise. Moreover, even if so imputed, this does not establish that the Debtors' business was a Ponzi scheme. Instead, PRLLC was a legitimate business enterprise focused as described in the PPMs and other marketing materials.[65]

---

[59] Plaint. Appx. pp. 478, 481, 484.

[60] Plaint. Appx. pp. 23–24; Brief, p. 3 n.9.

[61] Plaint. Appx. pp. 479, 482, 485.

[62] Plaint. Appx. pp. 23–24.

[63] Jackson Declaration, ¶¶ 23-26 (Def. Appx. 11-13).

[64] Roossien Dep. 89:1-91:9 (Def. Appx. 1399-1401).

[65] Smith Declaration, ¶¶ 4-6 (Def. Appx. 1332-34); Palmer Declaration, ¶¶ 2-3 (Def. Appx. 1343).

19.    Moreover, Plaintiff's reliance on (i) Blimline's historical conduct in connection with JRR Enterprises business in Michigan, and (ii) the guilty pleas the Merkles and others based on conduct occurring in Michigan between 2004 and 2006 and pertaining to entities completely unrelated to the Debtors is baseless and misleading.  Instead, any misconduct by Blimline or anyone else in Michigan long before the Transfers at issue here, involving entities completely unrelated to the Debtors, is irrelevant to the issue of whether the Debtors' business constituted a Ponzi scheme at the time of the Transfers.

20.    The recitations in Melbye's and Blimline's factual statements likewise fail to prove that the Debtors were operating a Ponzi scheme at the time of the Transfers.  First of all, while both Melbye and Blimline admitted to making misrepresentations to investors, neither expressly state that the Debtors constituted a Ponzi scheme at any point in time or allege that the Debtors were not engaged in a legitimate business.  In fact, the only factual recitations having any probative value on the issue of whether the Debtors operated a Ponzi scheme are (i) the statement that "Provident used investor funds from one Shale offering to pay investor dividends in other Shale offerings,"[66] and (ii) the false representation made to investors "[t]hat the proceeds raised by one PPM Project would not be used to pay dividends for any other PPM Project."[67]

21.    As discussed in Jackson's declaration and expert report, however, the Debtors consolidated cash and acquisition activities in certain entities,[68] which is a normal business practice and reasonable business strategy to maximize efficiency and minimize costs.[69]  Thus, the stipulations in Blimline's and Melbye's factual statements simply constitute an acknowledgement that the PPMs failed to disclose that funds from all of the Debtors were being

---

[66] Plaint. Appx. pp. 205, 475.

[67] Plaint. Appx. p. 204.

[68] Jackson Report, ¶¶ 21-29 (Def. Appx. 24-27).

[69] Jackson Report, ¶¶ 17, 21-29 (Def. Appx. 22-27).

centralized and commingled.[70]  While the commingling of the Debtors' funds may have

constituted a fraud on the Debtors' investors to the extent the PPMs did not disclose that funds

would be commingled, this does not establish that the Debtors' overwhelming business activity

was illegitimate or that their business was a Ponzi scheme "based on the manufacturing of

'returns' to investors from other investors' contributions."[71]  Further, as discussed, the Debtors

had sufficient non-investor resources available to pay investor dividends at the time of the

Transfers.[72]  Thus, the Blimline and Melbye factual statements fail to establish that the Debtors

were operating a Ponzi scheme at the time the Transfers occurred.

22.     Finally, the Blimline and Melbye factual statements lack probative value because

of their lack of specificity in terms of the Debtors entities involved and the timing of the alleged

wrongful conduct.  The Transfers to Ruthven were made by seventeen (17) separate Debtor

entities.[73]  It is impossible to tell from Blimline and Melbye's statements which of the Debtors

are implicated.  Further, it is unclear as to exactly when Blimline and Melbye contend the

practice of using funds invested in one "Shale offering" to pay dividends in "other Shale

offerings" began or when it stopped.  Thus, it is impossible to tell from the factual statements

whether this practice was taking place at the time the Transfers occurred.  Drawing all inferences

in favor of Ruthven, as the non-moving party,[74] the statements of Blimline and Melbye fail to

demonstrate that the Debtors were operating a Ponzi scheme at the time of the Transfers, much

---

[70] Jackson Report, ¶ 17 (Def. Appx. 22-23).

[71] *Am. Cancer Soc'y v. Cook,* 675 F.3d at 526; *Gold,* 2012 Bankr. LEXIS 3554 at *27.

[72] Jackson Report, ¶¶ 26-35 (Def Appx. pp. 26-30).

[73] *See* list of Ruthven Transactions, Plaint. Appx. pp. 23–24.

[74] *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) ("'On summary judgment the
inferences to be drawn from the underlying facts…must be viewed in the light most favorable to the party opposing
the motion.'" (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962))); *Impossible Elecs. Techniques, Inc.
v. Wackenhut Protective Sys., Inc.,* 669 F.2d 1026, 1031 (5th Cir. 1982) (in deciding a motion for summary
judgment, "courts should view the evidence introduced and all factual inferences from that evidence in the light
most favorable to the party opposing the motion.…Summary judgment may be inappropriate even where the parties
agree on the basic facts, but disagree about the factual inferences that should be drawn from these facts.").

less prove it as a matter of law.

> **2.   Even Assuming *Arguendo* That the Debtors Were Operating a Ponzi Scheme at the Time of the Transfers, the "Ponzi Scheme Presumption" Does Not Apply Because the Transfers Were Not Made *in Furtherance of* the Alleged Ponzi Scheme**

23.     As noted above, Plaintiff relies exclusively on the "Ponzi scheme presumption" to

prove the Debtors' fraudulent intent in this case.  However, in order for the "Ponzi scheme

presumption" to apply to the Transfers, Plaintiff must show that each of the Transfers was made

*in furtherance of* the alleged Ponzi scheme.[75]  In other words, while the nature of a Ponzi

scheme supports a general presumption that payments made in furtherance of such a scheme

were made with fraudulent intent, not every individual transfer made by the operator of a Ponzi

scheme is fraudulent.  Rather, for the Ponzi scheme presumption to apply, "the transferor must

have intended that the transfer facilitate the preservation of the scheme, undetected by its current

creditors and future investors."[76]

24.     The *Welt* case is instructive.  In *Welt,*[77] the plaintiff asserted—just as Plaintiff

---

[75] *See, e.g., In re Petters Co.*, 495 B.R. at 908 ("Under the judicial articulation of the presumption since its early days, the inference of fraudulent intent applies to transfers made '*in furtherance of*' a Ponzi scheme….[T]he qualifier is a key part of the presumption—the transfer must be '*in furtherance of*' the larger scheme. It is central to the presumption's defensibility." (emphasis added)); *Vaughan Co.*, 500 B.R. at 789-790 ("In addition to proving the existence of a Ponzi scheme, the movant must sufficiently connect the relevant transfers to the Ponzi scheme."); *Bank of Am, N.A. v. Kapila (In re Pearlman)*, 478 B.R. 448, 454 (M.D. Fla. 2012) ("As noted by the bankruptcy court, the Trustee will have to establish…that the transfers at issue were in fact made in furtherance of a Ponzi scheme before he can rely on the Ponzi scheme presumption as a means of establishing actual intent to defraud by the transferor…."); *Kapila v. Phillips Buick-Pontiac-GMC Truck, Inc. (In re ATM Fin. Servs., LLC)*, 2011 Bankr. LEXIS 2394, *17 (Bankr. M.D. Fla. June 24, 2011) ("To establish the debtor's fraudulent intent with regard to the specific transfers at issue in this case, the trustee must show that *each transfer* was made *in furtherance of* the Ponzi scheme." (emphasis in original)); *Welt v. Publix Super Markets, Inc. (In re Phoenix Diversified Inv. Corp.)*, 2011 Bankr. LEXIS 4100, *7-8 (Bankr. S.D. Fla. June 2, 2011) ("In order to apply the Ponzi scheme presumption, the plaintiff must show that the transfers in question were in furtherance of the Ponzi scheme."); *In re Manhattan Inv. Fund Ltd.*, 397 B.R. 1, 11 (S.D.N.Y. 2007) (holding that a transfer must "further a Ponzi scheme" for the "Ponzi scheme presumption" to apply).

[76] *Stoebner v. Ritchie Capital Mgmt., L.L.C. (In re Polaroid Corp.)*, 472 B.R. 22, 53 (Bankr. D. Minn. 2012).

[77] In *Welt*, the Plaintiff sought summary judgment on his state law fraudulent transfer claim brought under section 544 of the Bankruptcy Code and sections 726.105(1)(a) and 726.108 of the Florida Statutes.  2011 Bankr. LEXIS 4100, at *6.  However, the intent element under Florida Statute 726.105(1)(a) tracks that of section 548(a)(1)(A) of the Bankruptcy Code in that it provides for the avoidance of transfers made "with actual intent to hinder, delay, or

asserts in this case—that the mere fact that the debtor operated a Ponzi scheme was sufficient to

show that the transfers in question were made with fraudulent intent. However, in denying the

plaintiff's motion for summary judgment, the *Welt* court stated as follows:

> Courts have routinely held that where a debtor was involved in a
> Ponzi scheme, the debtor had actual intent to hinder, delay and
> defraud creditors. In its summary judgment motion, the plaintiff
> relies on this so-called Ponzi scheme presumption. . . .
>
> ***The plaintiff overlooks a step in this analysis. In order to apply
> the Ponzi scheme presumption, the plaintiff must show that the
> transfers in question were in furtherance of the Ponzi scheme.
> The existence of a Ponzi scheme supports a finding that the
> debtor had a generalized intent to defraud. But this is not
> sufficient, by itself, to show that the transfers in question were
> made with fraudulent intent. Transfers subject to the Ponzi
> scheme presumption are those that perpetuate the scheme, or
> that are necessary to the continuance of the fraudulent scheme.
> This is the reason that case law applying the Ponzi scheme
> presumption typically involves claims against investors,
> [investment] brokers, and others who assisted in perpetrating the
> scheme.***
>
> There are several cases holding that the transfers in question must
> be in furtherance of the Ponzi scheme for the Ponzi scheme
> presumption to apply…. As these decisions make clear, ***the
> existence of a Ponzi scheme coupled with transfers by the debtor,
> without evidence tying the transfers to perpetuation of the
> scheme, will not implicate the Ponzi scheme presumption.***[78]

As the court in *Welt* recognized, for the "Ponzi scheme presumption" to apply to a given transfer,

it must be shown that the transfer was made in furtherance of the Ponzi scheme or was necessary

to the continuance of the scheme.[79]

      25.     Plaintiff completely ignores the issue of whether the Transfers were made in

furtherance of the alleged Ponzi scheme and has presented no evidence on this crucial issue. The

---

defraud any creditor of the debtor." Fla. Stat. § 726.105(1)(a).

[78] *Welt*, 2011 Bankr. LEXIS 4100, at *7-9 (emphasis added).

[79] *Id.* at *8.

mineral properties purchased through the Transfers were real minerals acquired from a real broker of such properties through a series of legitimate purchase transactions. These acquisitions were consistent with Debtors' stated business plan. Such transactions, on their face, are not the type which would be made to perpetuate a Ponzi scheme.

26.    This is especially true if Ruthven, as the transferee, was not a participant within the scheme. Crucially, Plaintiff has not alleged, nor is there any evidence to suggest, that the Defendants were actively involved in the Debtors' alleged Ponzi scheme, colluded with the perpetrators of the scheme, or even knew about the scheme. Plaintiff likewise fails to allege or offer any evidence that the Ponzi scheme somehow benefitted, financially or otherwise, by transactions with Ruthven or from the Transfers or that the Transfers furthered the Debtors' alleged Ponzi scheme or were otherwise necessary to its continuation.

27.    Indeed, if the Debtors were truly engaged in a Ponzi scheme, the Transfers to Ruthven would actually undermine, rather than further, the purported scheme. In a classic Ponzi scheme, the enterprise does not purchase assets with investor money but, rather, sets up a pyramid whereby returns to prior investors are paid with contributions from subsequent investors. Plaintiff, by contrast, has asserted that the Debtors grossly overpaid for the Assets. However, overpaying for the Assets would merely deplete the Debtors' cash reserves more rapidly, thereby causing the alleged Ponzi scheme to collapse more quickly. Thus, Plaintiff's assertion that the Debtors grossly overpaid for the Assets is at odds with his reliance on the "Ponzi scheme presumption" and he fails to present any evidence or analysis showing what incentive the perpetrators of the alleged Ponzi scheme might have had to overpay for the Assets or how such overpayment helped to further the alleged scheme.

28.    Furthermore, because the Debtors' purchase of mineral properties was completely

consistent with the PPMs and the Debtors' stated business plan, there is no basis to conclude that

the Transfers were made in furtherance of the Debtors' alleged Ponzi scheme.[80] Instead, the

Transfers were exactly the type of purchases that the Debtors told investors that they would

make with the invested funds and were fully consistent with the Debtors' stated business plan.

In view of this, at a minimum, there is a fact issue as to whether the Transfers were made in

furtherance of the Debtors' alleged Ponzi scheme.

**B.    PLAINTIFF IS NOT ENTITLED TO SUMMARY JUDGMENT ON RUTHVEN'S SECTION 548(c) DEFENSE**

29.    Even if Plaintiff were able to demonstrate that the Transfers were intentionally

fraudulent, which Ruthven disputes, he still cannot avoid the Transfers based on Ruthven's

defense under section 548(c) which provides, in pertinent part:

> [A] transferee or obligee of [ ] a transfer or obligation that takes for value and in
> good faith has a lien on or may retain any interest transferred ... to the extent that
> such transferee or obligee gave value to the debtor in exchange for such transfer
> or obligation.[81]

Even if the Transfers were intentionally fraudulent, they cannot be avoided because Ruthven

acted in good faith and gave the Debtors value in exchange for the Transfers.[82]

---

[80] *See In re Foos*, 188 B.R. at 244 ("[W]hen an action is brought to recover payments that were part of the Ponzi scheme it is reasonable to presume an intent to defraud. Where, as here, however, the individual who is operating the Ponzi scheme conducts ordinary business transactions outside of the Ponzi scheme, the basis for presuming fraud is not present...").

[81] 11 U.S.C. § 548(c).

[82] *See, e.g., Jimmy Swaggart Ministries v. Hayes (In re Hannover Corp.)*, 310 F.3d 796, 799 (5th Cir. 2002) ("With 11 U.S.C. § 548(c), Congress provided transferees a defense against a trustee's (or debtor's) successful demonstration of an actual or constructive fraudulent transfer under [section 548] of the Bankruptcy Code."); *Balaber-Strauss v. Sixty-Five Brokers (In re Churchill Mortg. Inv. Corp.)*, 256 B.R. 664, 676 (Bankr. S.D.N.Y. 2000) ("Thus, even a transferee who is able to show that a debtor made a transfer with intent to defraud, hinder or delay will be unable to recover against a transferee who takes for "value and in good faith' under the Bankruptcy Code."), *aff'd sub nom. Balaber-Strauss v. Lawrence*, 264 B.R. 303 (S.D.N.Y. 2001); *Williams v. BBVA Compass Bank (In re Positive Health Mgmt.)*, 2012 U.S. Dist. LEXIS 127520, *8 (S.D. Tex. Sept. 7, 2012) ("Section 548(c) provides transferees ... a defense against a trustee's successful demonstration of an actual or constructive fraudulent transfer...."); *Hirsh v. Cahill (In re Colonial Realty Co.)*, 210 B.R. 921, 923 (Bankr. D. Conn. 1997) ("Bankruptcy Code § 548(c) ... provides an exception to the voidability of fraudulent transfers in favor of a transferee that 'takes for value and in good faith ... to the extent that such transferee ... gave value to the debtor in exchange for the transfer....'").

30.    As the transferee, Ruthven has the burden of proof on its defense.[83] Thus, to
prevent summary judgment, Ruthven must demonstrate that material questions of fact exist
regarding (i) whether Ruthven took value from the Debtors in good faith, and (ii) whether
Ruthven gave value in exchange.[84] In evaluating the evidence in the summary judgment record,
all inferences must be drawn in favor of Ruthven as the non-movant.[85]

### 1.    Ruthven Acted in Good Faith With Respect to the Transfers

31.    The Bankruptcy Code does not define "good faith" for purposes of section
548(c).[86] Because good faith is not susceptible of a precise definition, the issue of whether a
particular transferee acted in "good faith" is particularly fact-intensive and must be determined
on a case-by-case basis.[87] Thus, as is true in cases involving the presence or absence of an intent
to defraud, summary judgment is likewise inappropriate in cases involving the subjective
question of whether a defendant received a transfer in good faith.[88] In considering good faith,
courts generally examine what the transferee, as a reasonably prudent person, should have
known instead of what they actually knew related to the allegedly fraudulent transaction.[89] The
primary question is whether the transferee had information that put it on inquiry notice that the

---

[83] *Jimmy Swaggart*, 310 F.3d at 799; *Templeton v. O'Chesky (In re Am. Housing Found., Inc.)*, 2014 U.S. Dist. LEXIS 51415, *9 (N.D. Tex. Apr. 11, 2014).

[84] *Id.*

[85] *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 ("On summary judgment the inferences to be drawn from the underlying facts … must be viewed in the light most favorable to the party opposing the motion.") (quoting *United States v. Diebold, Inc.*, 369 U.S. at 655).

[86] *Jimmy Swaggart*, 310 F.3d at 800 ("[T]he unpredictable circumstances in which the courts may find its presence or absence render any definition of 'good faith' inadequate, if not unwise."), *citing*, 5 COLLIER ON BANKRUPTCY ¶548.07[2][a]; *Brown v. Third Nat'l Bank (In re Sherman)*, 67 F.3d 1348, 1355 (8th Cir. 1995).

[87] *Sherman*, 67 F.3d at 1355.

[88] *Merrill v. Abbott (In re Indep. Clearing House, Co.)*, 77 B.R. 843, 862 (D. Utah 1987); *Colonial Realty*, 210 B.R. at 923.

[89] *Warfield v. Byron*, 436 F.3d 551, 559-60 (5th Cir. 2006), *citing, In re Sherman*, 67 F.3d at 1355; *Templeton*, 2014 U.S. Dist. LEXIS 51415 at *11; *World Vision Entm't*, 275 B.R. 641, 658-59 (Bankr. M.D. Fla. 2002).

transferor was insolvent or that the transaction might be made with a fraudulent purpose.[90]

32.    In the context of a commercial transaction, courts also look at whether the

transaction carries the earmarks of an arm's length bargain.[91]  As a result,

> [s]ome recipients, such as insiders directly running the Ponzi scheme, obviously
> could not demonstrate good faith because of their involvement in the enterprise
> and their actual knowledge of the fraud. *Other recipients, such as third party
> vendors …, probably can demonstrate good faith with relative ease.  These types
> of recipients only deliver goods … and have no reason and, more importantly,
> no duty to inquire into the nature of the debtor's business.*[92]

Thus, as a defense "specifically designed to protect transferees, not transferors,"[93] section 548(c)

provides a safe haven for a vendor, such as Ruthven, who provide goods or services to a debtor

in an arm's length commercial transactions without knowledge or reason to believe the debtor

was involved in a Ponzi scheme and no duty to investigate the debtor's business.[94]

### a.    The "Ponzi Scheme Presumption" Does Not Apply to Ruthven's State of Mind

33.    Even assuming *arguendo* that the Debtors were operating a Ponzi scheme, this is

insufficient to negate Ruthven's good faith for purposes section 548(c).  The "Ponzi scheme

---

[90] *Templeton*, 2014 U.S. Dist. LEXIS 51415 at * 11-12.

[91] *Sherman*, 67 F.3d at 1355; *Templeton*, 2014 U.S. Dist. LEXIS 51415 at * 12; *see also, e.g., O'Chesky v. Horton (In re Am. Hous. Found.)*, 2011 Bankr. LEXIS 3837, *66-67 (Bankr. N.D. Tex. Sept. 30, 2011); *Indep. Clearing House*, 77 B.R. at 862; *Colonial Realty*, 210 B.R. at 923 ("Case law holds that, although no precise definition is possible, good faith requires that the transaction have the 'earmarks of an arm's length bargain.'").

[92] *World Vision Entm't*, 275 B.R. at 658-59.  However, the court in *World Vision Entm't* ultimately concluded that the brokers involved in that case, who sold unregistered promissory notes forming the basis of the debtor's Ponzi scheme, did not act in good faith because they had a duty to investigate the legitimacy of such promissory notes but took no action to determine if the debtor was a legitimate business or to otherwise assess the debtor's financial condition.  *Id.* at 659-660.  Here, however, Ruthven was a broker of mineral properties and, as such, had no such duty.  See Holland Aff., ¶¶ 10, 18, 27 (Def. Appx. 1415-16, 1424, 1427); Deposition of Owen Barnhill, pp. 93:10-94:2; 133:1-134:7; 142:16-143:1 ((Def. Appx. 2751-52).

[93] *Jimmy Swaggart*, 310 F.3d at 802 (*citing* 5 COLLIER ON BANKRUPTCY ¶548.07); *see also, e.g., Welt*, 2011 Bankr. LEXIS 4100 at *13.

[94] *See, Jimmy Swaggart*, 310 F.3d at 801-02 (describing section 548(c) as providing "a means by which [a debtor's] unwitting trading partner can protect himself" and cautioning against the adoption of too broad a rule concerning "good faith" where the fraudulent conveyance action involved payments by the debtor to an unaffiliated third party in an arm's length transaction); *Boyer v. Crown Stick Distrib.*, 587 F.3d 787, 793 (7th Cir. 2009) (Posner, J.) (discussing fact that, in addition to protecting creditors, fraudulent conveyance doctrine also serves the purpose of "assuring third parties that transactions done with the debtor at arm's length will not be undone.").

presumption" is only applicable, if at all, to the fraudulent intent of the Debtor transferors. For purposes of section 548(c), the focus is on Ruthven's state of mind. The presumption of fraudulent transfer applies to the Debtors only and does not extend to the state of mind of Ruthven as transferee. Therefore, even if the Debtors were operating a Ponzi scheme, there is no presumption regarding Ruthven's state of mind for purposes of the section 548(c) defense.

### b. The Arm's Length Nature of Ruthven's Engagement by the Debtors Shows That Ruthven Acted in Good Faith

34.    The summary judgment record clearly reflects that Ruthven's engagement has the earmarks of an arm's length transaction, thus indicating that Ruthven acted in good faith in connection with the Transfers.[95] Ruthven was engaged by the Debtors as a broker to acquire mineral properties in specific prospects in Oklahoma on behalf of the Debtors. Under the terms of Ruthven's engagement, the Debtors would identify the mineral prospect, specify the price to be paid for the mineral prospects, and pay Ruthven a commission for (i) brokering the transaction, and (ii) providing a warranty of title in connection with the mineral properties acquired.[96] As a broker, Ruthven's duties did not include any analysis of the mineral prospect or its value.[97] Indeed, the Debtors required Ruthven and its principals to sign a confidentiality agreement to protect their plays in certain areas from competitors, which precluded Ruthven from engaging any third parties to evaluate their potential value in any event.[98]

---

[95] *Sherman*, 67 F.3d at 1355; *Templeton*, 2014 U.S. Dist. LEXIS 51415 at * 12; *see also, e.g., O'Chesky*, 2011 Bankr. LEXIS 3837 at *66-67; *Indep. Clearing House*, 77 B.R. at 862; *Colonial Realty*, 210 B.R. at 923.

[96] Holland Aff. ¶¶ 17e, 28, 30g, 39, 79 (Def. Appx. 1422, 1427-29, 1433, 1438, 1461-62); Expert Report of Owen Barnhill, pp. 4, 6 (Def. Appx. 2787-89); Barnhill Dep. 120:2-122:18; 186:6-25; 219:17-222:11; 227:3-18 (Def. Appx. 1422, 1427-29, 1433, 1438, 1461-62).

[97] Holland Aff., ¶¶ 10, 18, 27, 29, 30a, 43 (Def. Appx. 1415-16, 1424, 1427, 1429-30, 1440-41); Barnhill Dep. 133:23-134:7; 142:16-143:1 (Def. Appx. 2759-60, 2764-65).

[98] Holland Aff., ¶ 35 (Def. Appx. 1435-36).

35.    Ruthven's compensation arrangement was also negotiated at arm's length.[99]  The
fees that Ruthven charged the Debtors for its services were in accordance with the industry
standards and were in line with those charged by Ruthven to its other clients for similar
transactions.[100]  As Ruthven continued to do business with the Debtors and the volume of
mineral properties delivered increased, PRLLC negotiated a decrease in Ruthven's compensation
per net mineral acre.[101]  Indeed, at the time Ruthven ceased doing business with the Debtors, its
compensation had decreased from approximately $500 per net mineral acre to approximately
$150 to $200 per net mineral acre, which was well below the rate that Ruthven typically charged
for its services.  Debtors had sufficient bargaining leverage to negotiate this reduced rate because
of the high volume of transactions.[102]

    *c.*    ***Ruthven Had No Reason to Believe the Debtors' Business Was Not
        Legitimate and No Duty as a Trade Counterparty to Investigate***

36.    Wendell Holland, the managing member of Ruthven, had no reason to believe that
Debtors' business was anything other than a legitimate oil and gas exploration and investment
program.[103]  Over the course of more than two years, the Debtors acquired a substantial portfolio
of oil and gas assets, including leases and mineral properties.  Ruthven was not the Debtors' only
broker and brokered only a portion of mineral properties owned by the Debtors.  The Debtors'
oil and gas leases were likewise acquired from other legitimate brokers.  Ruthven provided only
a fraction of the Debtors' mineral acquisitions, and the majority of the Debtors' oil and gas assets

---

[99] Holland Aff., ¶¶ 17, 36, 40 (Def. Appx. 1436-39); Barnhill Report, p. 3 (Def. Appx. 2786); Barnhill Dep. 225:15-226:19; 236:11-25 (Def. Appx. 2775-76, 2779).

[100] Holland Aff., ¶¶ 17h, 20, 30.g, 38 (Def. Appx. 1423, 1425, 1433, 1437-38); Barnhill Report, pp. 3, 6 (Def. Appx. 2786, 2789); Barnhill Dep. 140:21-141:2 (Def. Appx. 2762-63).

[101] Holland Aff., ¶¶ 16, 36, 38, 40, 48 (Def. Appx. 1418-19, 1436-39, 1443); Barnhill Report, p. 2 (Def. Appx. 2785); Barnhill Dep. 128:4-129:14; 236:11-25 (Def. Appx. 2757-58, 2779).

[102] Holland Aff., ¶¶ 41, 50c (Def. Appx. 1439-40, 1444-45); Barnhill Dep. 128:4-129:14; 236:11-25 (Def. Appx. 2757-58, 2779).

[103] Holland Aff., ¶¶ 49-52 (Def. Appx. 1443-47).

was acquired from other reputable brokers.[104]    Thus, the volume and pace of the Debtors'

acquisitions gave the impression that the Debtors' business was a thriving and growing

enterprise.[105]

37.    Further, there was no corporate affiliation between Ruthven and the Debtors, and

Mr. Holland was not an officer, director, or employee of any of the Debtors.[106]    In addition,

neither Ruthven nor Mr. Holland invested in or had any ownership interest in any of the Debtors,

and neither ever sold or acquired any of the any of the participation interests the Plaintiff

contends form the basis of the Debtors' alleged Ponzi scheme.[107]    In this regard, they were not

insiders, nor did they have access to any of the Debtors' financial information.[108]

38.    As discussed above, because the commissions were in line with (or lower than)

the rates customarily charged by Ruthven for similar work, there was nothing about Ruthven's

compensation structure that would have put it on inquiry notice that the Debtors were operating

anything other than a legitimate oil and gas exploration and investment program.

39.    Over the course of Ruthven's dealings with the Debtors, Mr. Holland understood

that the Debtors had a very substantial portfolio of oil and gas leases and mineral properties.[109]

In addition, Mr. Holland was aware that Provident had entered into a substantial agreement with

Sinclair, a very large and well-known oil company, pursuant to which Sinclair had agreed to

purchase half of the Debtors' oil and gas leases and mineral properties in the Woodford Shale

---

[104] Holland Aff., ¶ 56 (Def. Appx. 1448-49).

[105] Holland Aff., ¶ 50d (Def. Appx. 1445).

[106] Holland Aff., ¶ 69 (Def. Appx. 1454-55); Barnhill Report, p. 3 (Def. Appx. 2786); Barnhill Dep. 151:17-154:21 (Def. Appx. 2766-69).

[107] Holland Aff., ¶ 69 (Def. Appx. 1454-55).

[108] Holland Aff., ¶ 69  (Def. Appx. 1454-55).

[109] Holland Aff., ¶¶ 50a, 56  (Def. Appx. 1444, 1448-49).

and pursue future mineral exploration and acquisitions jointly with the Debtors.[110] Thus, given the size of the Debtors' overall portfolio, and the strength of the Debtors' other business counterparties, such as Sinclair, there was simply no reason for Ruthven to have any suspicions regarding the legitimacy of Debtors' business operations.

40.    Finally, aside from Ruthven's subjective lack of knowledge regarding the legitimacy of the Debtors' business operations, the objective facts likewise demonstrate that Ruthven had no basis to suspect the Debtors of engaging in any fraudulent business activity. Specifically, as noted above, Sinclair, with all of its available resources, willingly entered into a joint venture with the Debtors, likewise unaware of that there was anything allegedly wrong with the Debtors' business. Moreover, at the time of the Transfers, the Debtors had obtained more than $100 million in financing from large institutional banks, including The Frost National Bank, JP Morgan Chase Bank, N.A. and Amegy Bank National Association.[111] Thus, it is inconceivable to see how a "mom and pop" operation like Ruthven, which likewise engaged in arm's length business transactions with the Debtors, could possibly have been expected to know or question the legitimacy of the Debtors generally or the Transfers specifically.

### d.    The Trustee's Evidence Fails to Negate Ruthven's Good Faith

41.    Plaintiff contends that Ruthven cannot demonstrate that it acted in good faith with regard to the Transfers because it was allegedly confronted with multiple warning signs that should have caused it to suspect that the Transfers were made with a fraudulent purpose. An examination of the Trustee's evidence on this point shows the contrary to be true.

### (i)    Holland Was Not a Longstanding Blimline Associate

42.    For example, on pages 8 and 22 of his Brief, Plaintiff contends that Ruthven and

---

[110] Holland Aff., ¶¶ 51-52 (Def. Appx. 1446-47).
[111] See Jackson Declaration, ¶ 13 (Def. Appx. 7).

Mr. Holland were "longstanding Blimline associates." The summary judgment evidence

presented by the Trustee, however, shows only that Ruthven did two transactions with Blimline-

related entities, both of which occurred long before the Transfers at issue here.[112] These two

transactions do not establish that Holland was a "longstanding Blimline associate." Further,

Ruthven's summary judgment evidence establishes that the few transactions Ruthven did with a

Blimline-related entity represented only a very small percentage of its overall business activities

and were conducted on an arms' length basis.[113]

>         **(ii)     Ruthven Was Not Aware of Any Wrongdoing by Blimline at the
>                    Time of the Transfers**

43.    Plaintiff also contends that the Debtors' association with Joseph Blimline

("Blimline") should have put Ruthven on notice that the Transfers were allegedly fraudulent.[114]

There is no support for this contention. Mr. Holland's affidavit unequivocally denies any

knowledge of any wrongdoing by Blimline at the time of the Transfers, all of which occurred

prior to Blimline's indictment in 2009.[115] While Blimline's plea agreement outlines wrongdoing

by Blimline in Michigan from 2004 and 2007, it was not entered until June 21, 2010. Because it

was not entered until after the Transfers, the entry of the Blimline Plea Agreement in 2010, after

the Transfers were made, could not have alerted Ruthven in 2007 and 2008 to any sort of

misconduct by the Debtors. This is especially true given the fact Mr. Holland understood

Blimline to be a "trend acquisition" consultant to the Debtors, and not an officer, director, or

employee.[116] Mr. Holland's understanding is supported by the fact that Blimline did not sign

either of Ruthven's engagement agreements with the Debtors, nor did he approve or sign any of

---

[112] Plaintiff Appx. pp. 780-81.

[113] Holland Aff., ¶ 60 (Def. Appx. 1450-51).

[114] Plaintiff's Brief, pp. 8-9, 22.

[115] Holland Aff., ¶ 71 (Def. Appx. 1456-57).

[116] Holland Aff., ¶¶ 17b, 19, 26, 84 (Def. Appx. 1420, 1424-25, 1427, 1463-64).

the Adoption Agreements between Ruthven and the Debtors pursuant to which the Transfers
were ultimately made.[117]

44.    Plaintiff also contends that certain emails Mr. Holland received in 2005 and 2006
should have caused Ruthven to suspect that the Transfers in 2007 and 2008 were somehow
fraudulent.[118]  This couldn't be further from the case.  The first email is a 2005 email from Eric
Merkle to Mr. Holland regarding his efforts to raise funds to pay the third installment due on a
loan.  In addition to the fact that the Merkles were not affiliated with the Debtors, there is
nothing in the email that should have caused Mr. Holland to believe that Merkle intended to raise
funds in an unlawful way, rather than by properly soliciting additional investors, obtaining a
loan, or even selling assets.[119]  Indeed, no explanation is offered by Plaintiff as to how an email
in 2005 from an individual not even associated with the Debtors should have put Ruthven on
notice in 2007 and 2008 that its transactions with the Debtors were allegedly fraudulent.

45.    Finally, Plaintiff points to two emails between Mr. Holland and Blimline in
August and September 2006.[120]  Both emails indicate that, early in the relationship between
Ruthven and the Debtors, a few of the Debtors' checks were returned for insufficient funds.  As
would any arm's length trade counterparty, Ruthven first warned the Debtors that it would not
continue to do business with them if they did not immediately make good on their checks.[121]
After the second occurrence, Ruthven advised the Debtors that any future transactions between
the parties would have to be closed by wire transfers and not checks.[122]  After implementing this

---

[117] Holland Aff., ¶ 26 (Def. Appx. 1427); Adoption Agreements (Def. Appx. 1525-2741).
[118] See Plaintiff's Brief, pp. 8-9, 22.
[119] Holland Aff., ¶ 65 (Def. Appx. 1452-53).
[120] See Plaintiff's Appx., pp. 797-98.
[121] See Plaintiff's Appx. p. 796.
[122] See Plaintiff's Appx., p. 798,

arrangement, the Debtors' wire transfers to close the mineral acquisitions always cleared.[123]

Because there were no subsequent payment issues, the problems in mid-2006 gave Ruthven no

reason to suspect that the Debtors' businesses were not legitimate.[124]

### (iii) Neither Ruthven nor Mr. Holland Were Insiders of the Debtors

46.    There is also no support for Plaintiff's contention that Mr. Holland was an

"insider" of the Debtors.[125]  Mr. Holland is not included in the statutory list of insiders set forth

in section 101(31)(B) of the Bankruptcy Code.  The statutory list is not exclusive, however, and

"insiders" of the Debtors would also include individuals with such an extremely close

relationship with the Debtors that they can exert influence over the Debtors such that their

business transactions are not at arm's length.[126]  Here, there is no evidence that Ruthven had any

sort of close relationship with the Debtors or that it had the ability to exert influence over their

actions or decisions.  To the contrary, the evidence shows that Ruthven served as a third party

broker of mineral properties that engaged in legitimate arm's length transactions with the

Debtors.  Further, although Mr. Holland agreed to allow the Debtors to use his name as an

"Advisory Board Member" in solicitation materials related to Shale Royalties, III, LLC,[127] the

honorary position entitled him to neither compensation nor any insider information regarding the

entity's affairs.[128]  Further, he never attended any board meetings or functioned as any kind of

board member.[129]  Finally, the questionnaire filled out by Mr. Holland at the request of the

Debtors' securities attorney led Mr. Holland to believe that Debtors were acting in compliance

---

[123] Holland Aff., ¶¶ 66-68 (Def. Appx. 1453-54).

[124] Holland Aff., ¶¶ 66-68 (Def. Appx. 1453-54).

[125] See Plaintiff's Brief, pp. 9, 22.

[126] *In re Premiere Network Servs.*, 333 B.R. 126, 128-129 (Bankr. N.D. Tex. 2005) (collecting cases) (Hale, J.).

[127] See Plaintiff's Appx., pp. 798-810.

[128] Holland Aff., ¶ 69 (Def. Appx. 1454-55).

[129] Holland Aff., ¶ 69 (Def. Appx. 1454-55).

with applicable securities law.[130]

> ### (iv)    There Were No "Warning Signs" That Put Ruthven on Inquiry Notice Regarding the Debtors' Business Operations

47.    Plaintiff also contends that Ruthven repeatedly disregarded alleged "warning signs" that should have alerted it to the fact that the Debtors were engaging in fraudulent business practices.[131]  Plaintiff first points to Blimline's suggestion that Ruthven did not need to pay the Oklahoma stamp tax as a purported red flag.  However, as Mr. Holland explained in his affidavit,[132] it was an industry custom, which Mr. Holland believed complied with Oklahoma law, to only pay stamp tax on the first transfer by the mineral owner to the broker or sub-broker.[133]  Mr. Holland saw no "red flag" in Blimline wanting to handle the stamp tax in the manner customary in the industry and which Mr. Holland believed to be legal and proper.

48.    Further, Plaintiff contends that Ruthven should have perceived the Merkles' indictment as a warning sign related to the legitimacy of the Debtors' business.[134]  However, the Merkles were not affiliated with the Debtors.  When he learned about their indictment in 2008, Mr. Holland questioned Blimline about it.  Blimline told Mr. Holland that he (Blimline) was not involved in any of the Merkles' misconduct and, in Blimline's opinion, the Merkles had gotten what they deserved.[135]  Because Mr. Holland understood that Blimline had merely consulted with the Merkles on trend acquisitions, as he did to Provident, the fact of their indictment did not cause Mr. Holland to suspect Blimline of any wrongdoing, and it certainly did not give him any reason to have any suspicions about the Debtors, with whom neither of the Merkles were

---

[130] See Plaintiff's Appx., pp. 801-805; see also, Holland Aff., ¶ 69 (Def. Appx. 1454-55).

[131] See Plaintiff's Brief, pp. 9, 22.

[132] Holland Aff., ¶¶ 73-74 (Def. Appx. 1457-59).

[133] Holland Aff., ¶¶ 73-74 (Def. Appx. 1457-59); see also, Barnhill Dep. 137:5-12 (Def. Appx. 2761).

[134] See Plaintiff's Brief, pp. 8-9, 22.

[135] Plaintiff's Appx. pp. 997-98.

affiliated.[136]  Indeed, Mr. Holland did not even find out about the Merkle indictment until

October 2008, near the end of his business relationship with the Debtors.

49.      Finally, the Trustee contends that Mr. Holland continued to do business with

Blimline after he pled guilty to criminal charges.[137]  This contention is completely disingenuous.

In September 2010, the Wendell Holland and Kari Holland Revocable Living Trust (the

"Holland Trust") acquired some mineral properties from an entity named Phoenix Petroleum

Partners, LLC ("Phoenix").[138]  The mineral deed does not reflect on its face that Phoenix is a

Blimline-related entity.  The Trustee's own summary judgment evidence demonstrates that Mr.

Holland was not aware that Phoenix was affiliated with Blimline.[139]  Once Mr. Holland learned

that Phoenix was a Blimline-related entity, he told its representative in no uncertain terms that he

would not be doing any further business transactions with Phoenix.[140]

### (v)  *Ruthven's Business Practices Do Not Call Its Good Faith into Question*

50.      The Trustee also contends that Ruthven's internal business practices call its good

faith into question.  However, the Plaintiff's contentions in this regard do not even relate to

Ruthven's business practices, but rather to the manner in which it maintained its records.[141]

Although Plaintiff asserts that Ruthven kept few records, the business of brokering mineral

properties is not very record intensive.[142]  This is particularly true because, once a mineral

property transaction closed and funded, all of the documents evidencing the mineral transaction,

---

[136] Holland Aff., ¶ 72 (Def. Appx. 1457).

[137] See Plaintiff's Brief, pp. 9, 22.

[138] See Plaintiff's Appx., p. 811.

[139] See Plaintiff's Appx. pp. 1022-1024; Holland Aff., ¶ 70 (Def. Appx. 1455-56).

[140] See Plaintiff's Appx., p. 1024; Holland Aff., ¶ 70 (Def. Appx. 1455-56).

[141] See Plaintiff's Brief, pp. 10, 22.

[142] Holland Aff., ¶ 75 (Def. Appx. 1459-60).

including Ruthven's warranty of title, would be recorded in the county deed records.[143] The

Trustee's own summary judgment evidence demonstrates that, even though Mr. Holland's home

was struck by lightning which destroyed his computer, the majority of his records related to the

Transfers were backed up on a memory stick which was produced to Plaintiff in discovery.[144]

Further, Ruthven maintained its business records with regard to the Transfers in the same exact

way as it maintained its business records related to other transactions.[145] Finally, the fact that

Mr. Holland had a practice of deleting his emails at the end of the day does nothing suggest a

lack of bad faith. Any emails Ruthven sent to or received from the Debtors would still be

maintained on the Debtors' computer server. Indeed, Plaintiff's summary judgment evidence

includes emails to and from Mr. Holland, presumably obtained from the Debtors' server.[146]

### (vi)    *Ruthven's Compensation Did Not Lopsidedly Favor Ruthven*

51.    Finally, the Plaintiff's contention that Ruthven's compensation structure so

lopsidedly favored Ruthven is just plain wrong. Ruthven's summary judgment evidence

establishes that the fees it charged the Debtors were either in line with, or lower than, the rates it

charged its other clients and the rates charged by other brokers for comparable services.[147] The

Plaintiff's attempt to equate Ruthven's brokerage services to the services provided by a land man

is unavailing.[148] While Ruthven utilized the services of a land man for title searches, it did not

provide such services itself.[149] Instead, Ruthven brokered acquisitions of the fee estate in the

---

[143] Holland Aff., ¶ 75 (Def. Appx. 1459-60).

[144] See Plaintiff's Appx., pp. 1004-05; see also, Holland Aff., ¶ 76 (Def. Appx. 1460).

[145] Holland Aff., ¶ 75 (Def. Appx. 1459-60).

[146] See Plaintiff's Appx. 796-98.

[147] Holland Aff., ¶¶ 17h, 29, 30g, 38 (Def. Appx. 1423, 1429, 1433, 1437-38, 1442-43).

[148] Plaintiff's Brief, pp. 10-11, 22.

[149] Holland Aff., ¶¶ 80 (Def. Appx. 1462).

mineral properties.[150]  In other words, as opposed to a mineral lease, where the owner retains its

ownership of the minerals but leases them for exploration and development, the mineral

acquisitions brokered by Ruthven for the Debtors involved a divestiture of all of the mineral

owner's interest in the minerals so sold.  A land man receives compensation regardless of the

success of his efforts, whereas a mineral broker's compensation is contingent upon a closure of a

transaction, often after identifying and attempting hundreds of unsuccessful prospects.  Further,

Ruthven provided a warranty of title with regard to the mineral properties acquired, which

exposed Ruthven to considerable contingent future liabilities.[151]  Finally, Ruthven's warranty

included an obligation to refund the Debtors' purchase price in the event of any title failures.[152]

Thus, the brokerage services provided by Ruthven are much more extensive than the services

traditionally provided by a land man[153] and, consequently, the rates customarily charged by land

men is irrelevant.

> ### e.    The Cases Relied on by Plaintiff to Support His Good Faith Argument Are Factually Distinguishable

52.    Finally, the cases relied on by Plaintiff to support his claims that Ruthven did not

act in good faith are factually distinguishable.  For example, the *Warfield* case involved a suit

against two investors in a Ponzi scheme who received significantly more funds from the scheme

than they invested.[154]  The defendant asserting the section 548(c) defense *knew before he*

*invested in the Ponzi scheme entity* that such entity (i) was under investigation by the SEC, (ii)

---

[150] Holland Aff., ¶¶ 80-81 (Def. Appx. 1462-63); Barnhill Report p. 4 (Def. Appx. 2787); Barnhill Dep. 228:6-17 (Def. Appx. 2778); Dep. of John Coughlon, 184:25-185:8 (Def. Appx. 2818-19).

[151] Holland Aff., ¶¶ 17e, 28, 30g, 39, 79 (Def. Appx. 1422, 1427-29, 1433, 1438, 1461-62); Barnhill Report, p. 6 (Def. Appx. 2789); Barnhill Dep. 219:17-222:11 (Def. Appx. 2771-74); Coughlon Dep., 186:20-187:6 (Def. Appx. 2820-21).

[152] Holland Aff., ¶¶ 28c, 30e  (Def. Appx. 1428-29, 1431-32); Barnhill Report, p. 6 (Def. Appx. 2789); Barnhill Dep. 219:17-222:11 (Def. Appx. 2771-74).

[153] Holland Aff., ¶ 2 (Def. Appx. 1411).

[154] *Warfield*, 436 F.3d at 553.

was being offered by the same people that operated a prior entity, in which he had also invested, that had been placed in receivership, and (iii) required each participant to open an offshore account for the receipt of all commission transfers.[155] Despite such knowledge, the defendant both invested and recruited additional investors into the scheme, for which he received substantial payments.[156] The court thus found that the defendant's knowledge of the previous schemes and the existence of these suspicious circumstances raised questions about the defendant's good faith.[157] Here, by contrast, neither Ruthven nor its principal was an investor in the Debtors and neither solicited investors in the Debtors' securities. Instead, Ruthven was a third party vendor who provided legitimate brokerage services to the Debtors, through arm's length transactions, for the acquisition of mineral properties. The suspicious circumstances present in *Warfield* simply did not exist here.

53.    Moreover, the actions taken by the defendant in *Jimmy Swaggart*, and which the Plaintiff alleges Ruthven should have undertaken here, did not occur until *after* the defendant learned that the SEC had brought an enforcement action against the developer.[158] Thus, the *Jimmy Swaggart* case does not suggest that Ruthven had an obligation to investigate the Debtors *before* it had any knowledge or reason to believe they were engaged in any allegedly fraudulent business practices and/or *before* the initiation of an investigation into the Debtors by the SEC.

54.    Ultimately, in deciding the Plaintiff's Motion, the court "cannot *try* issues of fact, but can only determine whether there *are* issues of fact to be tried."[159] Here, there are clear issues of fact regarding what Ruthven knew or reasonably should have known regarding the

---

[155] *Id.* at 555.

[156] *Id.*

[157] *Id.* at 560.

[158] *Id.*

[159] *Colonial Realty*, 210 B.R. at 923 (emphasis in original).

Debtors' business at the time of the Transfers.  Indeed, Mr. Holland's affidavit alone, which

states unequivocally that he did not know or have any reason to suspect that the Debtors were not

legitimate, places the issue of Ruthven's good-faith squarely at issue.[160]  This is particularly true

given that all inferences from the summary judgment evidence must be drawn in Ruthven's

favor.[161]  Consequently, summary judgment is inappropriate in resolving the fact intensive

question of whether a transferee like Ruthven took in good faith.[162]

### 2.       Ruthven Gave Reasonably Equivalent Value in Exchange for the Transfers

55.     The second component of the section 548(c) defense allows a transferee who

"takes for value" to retain the transfer to the extent that it "gave value to the debtor in

exchange."[163]  This issue concerns whether Ruthven gave the Debtors reasonably equivalent

value in exchange for the Transfers, which is a question of fact.[164]  Further, this question is

evaluated from Ruthven's (rather than the Debtors') side of the exchange[165]

#### a.      *The Value Determination Must Be Evaluated from Ruthven's Perspective under Section 548(c)*

56.     Section 548(c) is defensive in character and is "specifically designed to protect

transferees, not transferors."[166]  Thus, instead of inquiring into the possibility and extent of a

debtor's loss, section 548(c) "provides a means by which the unwitting trading partner can

---

[160] *Id.*

[161] *Matsushita Elec. Indus. Co.,* 475 U.S. at 587.

[162] *Colonial Realty,* 210 B.R. at 923; Indep. Clearing House, 77 B.R. at 862.

[163] *Jimmy Swaggart,* 310 F.3d at 801; 11 U.S.C. § 548(c).

[164] *Id.*; *First Commer. Mgmt. Group v. Reinhardt (In re First Commer. Mgmt. Group),* 279 B.R. 230, 235 (Bankr. N.D. Ill. 2002).

[165] *Jimmy Swaggart,* 310 F.3d at 802; *Williams,* 2012 U.S. Dist. LEXIS 127520 at *9; *Welt,* 2011 Bankr. LEXIS 4100 at *13.

[166] *Jimmy Swaggart,* 310 F.3d at 802 (citing 5 Collier on Bankruptcy ¶548.07); *see also, e.g., Welt,* 2011 Bankr. LEXIS 4100 at *13.

protect himself."[167]  Specifically, the "provision looks at value from the perspective of the

transferee" and the analysis focuses on the value the transferee *gave*, and not on the value that

the Debtor actually *received*.[168]  Thus, in evaluating Ruthven's section 548(c) defense, the

concern, "quite properly, is for the transferee's side of the exchange, not the transferor's gain."[169]

      57.     In addition, whether value was given by Ruthven to the Debtors in exchange for

the Transfers must be determined as of the date of the Transfers.[170]

> The critical time is when the transfer is 'made.'  Neither subsequent depreciation
> in nor appreciation in value of the consideration affects the value question
> whether reasonably equivalent value was given.[171]

In other words, the fact that an investment may ultimately prove to be of little value does not

affect the determination of value on the date of the transfer.[172]  Finally, as with good faith, an

important element in the determination of reasonable equivalence includes fair market value and

---

[167] *Id.; see also, Boyer*, 587 F.3d at 793.

[168] *Jimmy Swaggart*, 310 F.3d at 802; *Welt*, 2011 Bankr. LEXIS 4100 at *13.; *see also, Positive Health Mgmt.*, 2012 U.S. Dist. LEXIS 127520 at *8-9.

[169] *Id.*

[170] *Jimmy Swaggart*, 310 F.3d 802 ("Thus, consistent with economic reality, this and other circuits unequivocally hold that for purposes of § 548 the value of an investment, even a risky one, ... is to be determined at the time of the purchase."), citing, *Butler Aviation Int'l, Inc. v. Whyte (In re Fairchild Aircraft Corp.)*, 6 F.3d 1119, 1126-27 (5th Cir. 1993); *Smith v. Woodforest Nat'l Bank (In re IFS Fin. Corp.)*, 2007 Bankr. LEXIS 4708, *21 (Bankr. S.D. Tex. May 3, 2007) ("Value is determined as of the date of the transfer."); *accord, In re Morris Comms. NC, Inc.*, 914 F.2d 458, 466 (4th Cir. 1990) ("The date for defining such reasonable equivalence is the date of the transfer...."); *Allard v. Flamingo Hilton (In re Chomakos)*, 69 F.3d 769, 770 (6th Cir. 1995) (same); *Liberatore v. 21st Century Satellite Comms., Inc. (In re 21st Century Satellite Comms., Inc.)*, 278 B.R. 577, 583 (Bankr. M.D. Fla. 2002) ("[T]he Court must focus strictly on each transaction as occurred, at the time it occurred....").

[171] *Morris Comms.*, 914 F.2d at 466, quoting, COLLIER ON BANKRUPTCY, § 548.09 at 116 (15th ed. 1984); *Chomakos*, 69 F.3d at 771.

[172] *See, e.g., Jimmy Swaggart*, 310 F.3d at 802 ("Without more, the fact that an option becomes worthless in no way proves that it was worthless at an earlier date."); *Chomakos*, 69 F.3d at 771 ("[An] investor in futures may win big, or his position may be wiped out, but the contractual right to a payoff if the market happens to move the right way at the right time constitutes a value reasonably equivalent to the money at risk."); *Smith*, 2007 Bankr. LEXIS 4708 at *22 ("The fact that the Notes ultimately proved to be of limited value does not affect the determination of value on the date of the transfer."); *Liberatore*, 278 B.R. at 583 (finding that it would be "ill-behooved indeed" for the debtor to complain about the price of the commissions it paid to brokers based on an arm's length negotiation with the brokers and that, "the fact that the business of the Debtor in selling these investments was ultimately found to be illegal and the Debtor was required to disgorge the commissions, [was] of no consequence.").

whether the transaction between the parties was at arm's length.[173]

>    **b.    Plaintiff's Value Argument Incorrectly Focuses on the Value of the Mineral Properties and Not the Value of Ruthven's Brokerage Services**

58.    Although the value issue is scarcely addressed in his Brief, Plaintiff alleges that Ruthven cannot show that it gave value to the Debtors in exchange for the Transfers because the mineral properties that the Debtors acquired had no more than nominal value. Attempting to support this position, Plaintiff mischaracterizes the transactions with Ruthven as though Ruthven was the owner of the mineral properties and sold a large volume of them to the Debtors. Instead, all of the transactions giving rise to the Transfers were brokerage transactions in which Ruthven acted solely as a broker.[174] Indeed, even Debtors' own expert, Dennis Roossien, agreed that, regardless of how the transactions were technically structured, Ruthven was a broker.[175] Moreover, Ruthven's final agreement with the Debtors was simply entitled "Broker Agreement."

59.    Ruthven was a vendor of legitimate brokerage services to Debtors. In all these brokerage transactions, Debtors would identify a mineral prospect in which they wished to acquire mineral properties.[176] The Debtors undertook all of the due diligence to analyze and evaluate the mineral prospect.[177] The Debtors would then instruct Ruthven how much they were

---

[173] *First Commer. Mgmt.*, 279 B.R. at 235.

[174] In evaluating a transaction alleged to constitute a fraudulent transfer, the courts will look to the substance rather than the form of transaction. *See, e.g., Boyer*, 587 F.3d at 793 ("[F]raudulent conveyance doctrine … is a flexible principle that looks to substance rather than form."); *Dillworth v. In re Best Prods., Co.*, 157 B.R. 222, 229 (Bankr. S.D.N.Y. 1993) ("In reality, collapsing transactions is little more than an effort on the part of the court to focus not on the formal structure of a transaction, but rather on the knowledge or intent of the parties involved in the transaction."); *see also*, 5 COLLIER ON BANKRUPTCY ¶ 548.03[6] (16th Ed. 2014) ("Fraudulent transfer law has always exalted substance over form….").

[175] Roossien Depo. pp. 77-76 (Def. Appx. 1397-98)

[176] Holland Aff. ¶¶ 17.c, 17.f, 30.b, 37 (Def. Appx. 1421-23, 1430-31, 1437); Barnhill Report, pp. 4-6 (Def. Appx. 2785, 2787, 2789); Barnhill Dep. 120:1-122:18; 133:23-134:7; 186:6-25; 227:3-18 (Def. Appx. 2754-56, 2759-60, 2770, 2777).

[177] Holland Aff. ¶¶ 17.g, 27, 43 (Def. Appx. _1423, 1427, 1440-41); Barnhill Dep. 120:1-122:18; 133:23-134:7; 186:6-25; 227:3-18 (Def. Appx. 2754-56, 2759-60, 2770, 2777).

willing to pay for mineral properties in that prospect.[178] Ruthven had no involvement in either

the evaluation or selection of the mineral prospect or the Debtors' determination as to how much

they would pay for mineral properties in the prospect.[179] Ruthven acted solely as a broker to

assist Debtors in acquiring mineral properties within prospects identified by them for a price

established by Debtors. Significantly, nowhere in Plaintiff's Brief does Plaintiff suggest that

Ruthven failed to properly or adequately perform these duties as broker or provided anything but

legitimate brokerage services to the Debtors.

60.    When a mineral property was actually acquired by Debtors, Ruthven acted solely

as an intermediary to transfer title to the property to Debtors. The owner would convey the

mineral property to Cianna, the sub-broker. Cianna would then convey the property to Ruthven.

Ruthven would in turn convey the property to the appropriate Provident entity with a limited

warranty of title (or what amounted to such).[180] The funds from the Debtors would then be

passed down the chain of title in the opposite direction. Ruthven would receive the money first

and deduct its broker's fees. The remaining funds would then be sent to Cianna, as sub-broker.

Cianna would then deduct its broker's fees and pay the remaining funds, which represented the

negotiated purchase price, to the mineral owners.[181]

61.    The Fifth Circuit has held that the issue of value under section 548(c) is evaluated

from Ruthven's (rather than the Debtors') side of the exchange.[182] Because section 548(c) is a

---

[178] Holland Aff. ¶¶ 17.c, 30.a, 37, 43 (Def. Appx. 1421-23, 1430-31, 1437); Barnhill Report, pp. 4-6 (Def. Appx. 2787, 2789); Barnhill Dep. 120:1-122:18; 133:23-134:7; 186:6-25; 227:3-18 (Def. Appx. 2754-56, 2759-60, 2770, 2777).

[179] Holland Aff. ¶¶ 17.g, 18, 27, 43 (Def. Appx. 1423-24, 1427, 1440-41); Barnhill Report, pp. 4-6 (Def. Appx. 2787, 2789); Barnhill Dep. 120:1-122:18; 133:23-134:7; 186:6-25; 227:3-18 (Def. Appx. 2754-56, 2759-60, 2770, 2777).

[180] Holland Aff. ¶¶ 23, 28, 30.c, 37, 39, 57, 58, 59 (Def. Appx. 1426, 1427-28, 1431, 1437, 1449-50); Barnhill Report, pp. 2-3 (Def. Appx. 2785-86); Barnhill Dep. 219:17-222:11 (Def. Appx. 2771-74).

[181] Holland Aff. ¶ 59 (Def. Appx. 1450).

[182] *Id.*, 310 F.3d at 802.

defensive statute designed to protect transferees, the issue of whether Debtors received reasonably equivalent value for the Transfers is evaluated from Ruthven's perspective as a broker in the transactions. Consequently, section 548(c) focuses on the value Ruthven gave as a broker, not on the value the Debtors actually received through the exchange.[183] In other words, the value inquiry under section 548(c) focuses on "the specific transaction which Plaintiff seeks to avoid, i.e. the quid pro quo exchange between the debtor and transferee, rather than an analysis of the transaction's overall value to the debtor as it relates to the debtor's business".[184] Largely ignoring this issue, Plaintiff devotes the overwhelming majority of his Brief to discussing Debtors' overall business operations, the alleged misuse of investor funds, the misconduct of Blimline and the alleged misconduct of others. However, all of this is irrelevant to the issue of whether Ruthven, as a vendor providing legitimate brokerage services, gave reasonably equivalent value to Debtors in exchange for the Transfers.[185]

62.    Viewed from Ruthven's side of the transaction, the exchange between the Debtors and Ruthven clearly constituted reasonably equivalent value. Based exclusively on their own due diligence, Debtors selected the mineral prospects and tasked Ruthven with acquiring mineral

---

[183] *Id.*; *Welt*, 2011 Bankr. LEXIS 4100 at *13; *Williams*, 2012 U.S. Dist. LEXIS 127520 at *8-9.

[184] *Churchill Mortg.*, 256 B.R. at 678 (emphasis in original); *see also, e.g., Image Masters, Inc. v. Chase Home Finance*, 489 B.R. 375, 390 (E.D. Pa. 2013) ("The proper focus of the reasonably equivalent value inquiry is the specific transaction sought to be avoided, not the transfer's collateral effects on the welfare of a debtor's business."); *In re Universal Clearing House Co.*, 60 B.R. 985, 1000 (D. Utah 1986) ("We conclude that a determination of whether value was given under section 548 should focus on the value of the goods and services provided rather than on the impact that the goods and services had on the bankrupt enterprise."); *Peterson v. Atradius Trade Credit Ins., Inc. (In re Lancelot Investors Fund, LP)*, 451 B.R. 833, 840 (Bankr. N.D. Ill. 2011) ("When determining whether the debtors received reasonably equivalent value, courts have to isolate the transactions between the debtors and the defendants so that the value exchanged can be assessed based on the contractual relationship between the parties and the quid pro quo thereunder.").

[185] *World Vision Entm't*, 275 B.R. at 658 ("Simply because a debtor conducts its business fraudulently does not make every single payment by the debtor subject to avoidance."); *Churchill Mortg.*, 256 B.R. at 681 ("The fact that the debtor's enterprise as a totality is operated at a loss, or in a manner that it fraudulent, does not render actually or constructively fraudulent a particular transaction which in and of itself is not fraudulent in any respect."); *Daly v. Deptula (In re Carrozzella & Richardson)*, 286 B.R. 480, 490 (D. Conn. 2002) ("[T]he proper focus of a fraudulent transfer inquiry is on the transfer itself, not the overall business practices of the Debtor.").

properties within these prospects at price points selected by the Debtors.[186] Ruthven then went

out and successfully acquired mineral properties within these prospects which fit the Debtors'

price guidelines and conveyed them to Debtors.[187] In exchange, Debtors paid Ruthven a sum

which included both broker's fees and the purchase price payable to the owners for the mineral

properties.[188] These funds were then passed down the chain of title through the sub-broker to the

property owners.[189] So viewed, Ruthven gave the Debtors everything that they had bargained for

and were entitled to receive as a part of the transaction.

63.    All Ruthven retained out of the Transfers was its broker's fees which were

calculated using one of two methods. The first method involved the Debtors fixing the price per

mineral acre that they would pay for mineral properties within the designated prospect.[190] To the

extent that Ruthven acquired the mineral properties from the owner for less, the spread between

Ruthven's acquisition price and the Debtors' purchase price constituted Ruthven's brokerage fee.

This method was used for calculating Ruthven's broker's fees on the acquisitions other than

those pursuant to the Broker Agreement in the Spindletop prospect.

64.    The broker's fees in the Spindletop prospect were calculated based upon a fee

payable to each of Ruthven and Cianna (as sub-broker) in a fixed dollar amount per net mineral

acre on delivery.[191] For the first acquisitions under the Spindletop prospect, Debtors agreed to

---

[186] Holland Aff. ¶¶ 17.c, 17.f, 17.g, 18, 27, 29, 30.a, 30.f, 43, 44 (Def. Appx. 1421-24, 1427-33, 1440-41); Barnhill Report, pp. 2, 4-6 (Def. Appx. 2785, 2787-89); Barnhill Dep. 120:1-122:18; 133:23-134:7; 186:6-25; 227:3-18 (Def. Appx. 2754-56, 2759-60, 2770, 2777).

[187] Holland Aff. ¶¶ 17.f, 28, 30.e, 37, 57, 58 (Def. Appx. 1422-23, 1428-29, 1431-32, 1437, 1449); Barnhill Report, pp. 2, 4-6 (Def. Appx. 2785, 2787-89); Barnhill Dep. 120:1-122:18; 133:23-134:7; 186:6-25; 227:3-18 (Def. Appx. 2754-56, 2759-60, 2770, 2777).

[188] Holland Aff. ¶¶ 17.c, 57-59 (Def. Appx. 1421, 1449-50).

[189] Holland Aff. ¶¶ 17.h, 29, 30.g, 46-48 (Def. Appx. 1423, 1429, 1433, 1442-43).

[190] Holland Aff. ¶¶ 36, 38, 40, 46-48 (Def. Appx. 1436-38, 1442-43); Barnhill Report, p. 3 (Def. Appx. 2786); Barnhill Dep. 120:1-122:18; 133:23-134:7; 186:6-25; 227:3-18 (Def. Appx. 2754-56, 2759-60, 2770, 2777).

[191] Holland Aff. ¶¶ 36, 38, 41 (Def. Appx. 1436-39); Barnhill Report, p. 3; Barnhill Dep. 120:1-122:18; 133:23-134:7; 186:6-25; 227:3-18 (Def. Appx. 2754-56, 2759-60, 2770, 2777).

pay broker's fees to each of Ruthven (as broker) and Cianna (as sub-broker) of $500 per net

mineral acre upon delivery. However, based upon the volume of acquisitions in the Spindletop

prospect, the Debtors were ultimately able to negotiate this broker's fee down to approximately

$150 to $200 to each of Ruthven and Cianna per net mineral acre by the end of that prospect. [192]

65.    Both methodologies are recognized as reasonable and customary methods for

calculating such broker's fees. Ruthven's fees, applying either method, were in line both with

the general market for such fees and what Ruthven charged other clients. Indeed, by the end of

the Spindletop prospect, the reduced broker's fees of $150 to $200 per net mineral acre were

substantially less than what Ruthven was charging to other clients.

66.    Once Ruthven had successfully carried out its assignment to acquire and convey

the mineral properties to Debtors, Debtors became obligated to make the Transfers to Ruthven

which included both the purchase price of the minerals and the broker's fees calculated as

agreed. Viewed from the broker's side of the transaction, Ruthven gave the Debtors everything

which they were entitled to receive through the transaction. The fact that these mineral

properties identified by Debtors purportedly did not meet their value expectations is irrelevant to

this analysis.

67.    Ruthven's services did not include any analysis or evaluation of either the mineral

prospects or the specific mineral properties which it acquired within the identified prospects.[193]

This evaluation process was undertaken exclusively by the Debtors who placed their own value

upon the mineral properties based on their own analysis. Ruthven simply executed the Debtors'

business decisions to acquire the properties designated by them at the specified price. Section

---

[192] Holland Aff. ¶¶ 18, 30.a, 43 (Def. Appx. 1424, 1430, 1440-41); Barnhill Report, p. 3 (Def. Appx. 2786); Barnhill
Dep. 120:1-122:18; 133:23-134:7; 186:6-25; 227:3-18 (Def. Appx. 2754-56, 2759-60, 2770, 2777).
[193] Holland Aff. ¶¶ 24-26, 28, 30.c, 37 (Def. Appx. 1426-29, 1431, 1437); Barnhill Dep. 93:10-94:2; 133:1-134:7;
142:16-143:1 (Def. Appx. 2754-56, 2759-60, 2770, 2777).

548(c) is designed to protect transferees like Ruthven, based on the value Ruthven gave in exchange for the Transfers.[194] It would be bizarre to apply the statute so as to exclude Ruthven from the scope of its protection even though Ruthven properly performed its assigned duties as broker, and was compensated solely on the basis of these brokerage services, because the Debtors purportedly failed to properly evaluate the value of the mineral properties it tasked Ruthven to acquire.

68.    While the brokerage fees paid to Ruthven and Cianna were substantial, the fee structures were the product of arm's length negotiations and were in line with or less than those charged to other clients. The total amount of the broker's fees became substantial based upon the high volume of the acquisition transactions conducted by Debtors based upon their own evaluations of the prospects. In the end, the aggregate amount of the broker's fees paid to Ruthven and Cianna was driven by the volume of mineral properties the Debtors elected to acquire. However, the fees for each individual transaction were reasonable.

69.    The same conclusion can be reached through an analysis of Debtors' obligations under Ruthven's brokerage contracts. Here, Debtors and Ruthven entered into two (2) contracts for brokerage services, a Master Purchase and Sale Agreement ("MPSA"), and a Broker Agreement (collectively with the MPSA, the "Brokerage Agreements"), both of which were negotiated at arm's length. Ruthven provided brokerage services to the Debtors under the Brokerage Agreements which gave rise to a contractual obligation by the Debtors to pay to Ruthven the purchase price for the minerals and the agreed brokerage fees for its services. Indeed, with every closing under the Brokerage Agreements, the Debtors also entered into an Adoption Agreement accepting the mineral property so conveyed and obligating them to pay to

---

[194] *Jimmy Swaggart*, 310 F.3d at 802.

Ruthven a specified sum which included both the purchase price for the minerals and the

brokers' fees for that transaction.[195]

70.    Section 548(d)(2)(A) of the Bankruptcy Code defines the term "value" to include

the satisfaction of a present or antecedent debt.  Upon receiving the conveyance of the mineral

properties, Debtors were obligated to pay to Ruthven both the purchase price for the property and

the agreed broker's fees.  The Debtors' contractual obligation to pay Ruthven the purchase price

for the mineral properties and the brokerage fees, both under the Brokerage Agreements and the

Adoption Agreements, constituted a present or antecedent debt that was satisfied by the

Transfers.[196]  By paying Ruthven the purchase price for the minerals and the agreed broker's

fees, the Debtors received reasonably equivalent value in the form of the satisfaction of the debt

to Ruthven under the Brokerage Agreements and Adoption Agreements.  As a result, the

Transfers caused no net depletion to the Debtors' estates.[197]

71.    There is also clear fact issues as to whether Ruthven was actually a "transferee" of

all of the funds which were included within the Transfers.  Under section 550, the provision of

the Bankruptcy Code through which Plaintiff seeks to recover any avoided Transfers from

---

[195] Holland Aff., ¶ 59 (Def. Appx. 1450); Barnhill Report, p. 2 (Def. Appx. 2785); Barnhill Dep. 120:1-122:18; 133:23-134:7; 186:6-25; 227:3-18 (Def. Appx. 2754-56, 2759-60, 2770, 2776).

[196] *See, e.g., First Commer. Mgmt.*, 279 B.R. at 239 (holding commissions paid to brokers pursuant to a legitimate contract were sheltered from avoidance under section 548(c)); *Liberatore*, 278 B.R. at 583-84 (holding brokers performing services pursuant to an arm's length broker agreement provided the appropriate *quid pro quo* in exchange for their commissions and fact that the investments they were selling were ultimately found to be illegal was of no consequence) *Churchill Mortg.*, 256 B.R. at 679-80 (analyzing broker cases and granting summary judgment to brokers on section 548(c) defense where brokers gave value by performing services and commissions were paid pursuant to a valid contract); *Universal Clearing*, 60 B.R. at 998-99 (holding commissions to brokers pursuant to a valid contract satisfied an antecedent debt and were not subject to avoidance); *cf., Dicello v Jenkins (In re Int'l Loan Network)*, 160 B.R. 1, 12 (Bankr. D.D.C. 1993) (discussing fact that whether the broker defendants provided value in exchange for the payments they received depended upon whether the debtors owed them a valid debt, the corollary of which is whether the defendants had a claim or right to payment against the debtors).

[197] *See, e.g., Scholes*, 56 F.3d at 758 (Posner, J.) (describing fact that payment of a valid obligation by the debtor does not result in a net depletion of the of the debtor's estate because the debtor receives equivalent consideration in the form of the release of the debtor's commensurate legal obligations to the transferee); *First Commer. Mgmt.*, 279 B.R. at 239 (finding debtor received reasonably equivalent value in exchange for paying broker commissions in for the form of a release of the claims the defendant could have asserted against the estate for unpaid commissions).

Ruthven, a party that receives a transfer directly from the debtor will not be considered to be the

initial transferee unless that party gains actual "dominion or control" over the funds.[198]  To have

dominion and control over a fund, a party must be "free to invest the whole amount in lottery

tickets or uranium stock if it wishes".[199]  Here, although Ruthven received the Transfers from the

Debtors, it only exercised dominion and control over its own brokerage fees.  To the extent that

the funds included within the Transfers included brokerage fees payable to Cianna or the

purchase price for the mineral properties payable to the owners, Ruthven acted solely as a

conduit to pass these funds through to the rightful owners.  Consequently, as a conduit or

intermediary that passed the purchase price for the minerals on to the mineral owners and

Cianna's broker's fees on to it, there is a clear issue of fact as to whether Ruthven was even a

transferee as those portions of the Transfers.

### c.    *Ruthven Was a Third Party Vendor of Legitimate Brokerage Services and Not a Broker of Securities*

72.    There are a number of cases decided under section 548(c) which involve

commissions paid to securities brokers who solicit investors for a debtor involved in a Ponzi

scheme.  Some of these cases involved innocent brokers who unknowingly solicited investors

for a Ponzi scheme and received commissions for their efforts.[200]  In these cases, the courts

found that, even though the brokers may have inadvertently perpetuated the Ponzi scheme, they

---

[198] *In re Coutee*, 984 F.2d 138, 140-141 (5th Cir. 1993)(A document "dominion and control" test in collecting cases of prior circuit courts which have adopted this standard).

[199] *Id.* at 141 (internal quotations and brackets omitted)(*quoting Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890 (7th Cir. 1980).

[200] *First Commer. Mgmt.*, 279 B.R. at 232-33 (innocent broker received substantial commissions for soliciting investors for the debtor's Ponzi scheme involving pay telephones without knowledge that the debtor's activities were fraudulent); *Churchill Mortg.*, 256 B.R. at 667 (innocent mortgage and investment brokers were paid commissions for producing mortgages and soliciting investors without any knowledge of the debtors' Ponzi scheme or allegation and no allegation was made that the brokers' own activities were fraudulent in and of itself); *Universal Clearing House*, 60 B.R. at 990 (innocent sales agents received commissions for soliciting investors in Ponzi scheme without knowledge that the factoring program in which they were selling investments did not exist); *cf., Liberatore*, 278 B.R. at 582-83 (brokers received commissions for selling illegal investments without knowledge that the investments were illegal).

nevertheless gave value to the debtor in exchange for their services.[201]  Other cases involve

transferees receiving money from the Ponzi scheme in excess of the amount of their investment

and who claimed an entitlement to these payments as commissions for recruiting additional

investors into the scheme.[202]  In cases involving brokers who were also investors in the Ponzi

scheme, courts have generally found any obligation to pay commissions to investors for

recruiting additional investors to be void on public policy grounds so that such transferees did

not provide value in exchange for these commissions.[203]

73.   Although the same basic section 548(c) analysis applies in this case as in those

cited above, there is a huge difference between those cases and the current one.  In the above

cases, the transferees were securities brokers who asserted that they gave value in exchange for

---

[201] *Balaber-Strauss*, 264 B.R. at 308 (finding debtors received value in exchange for commissions paid to brokers for performing facially lawful and customary services in good faith); *Universal Clearing House,* 60 B.R. at 1000 (finding services provided by innocent brokers provided value to the debtors and remanding to the bankruptcy court to determine issue of reasonable equivalence where bankruptcy court originally found that the brokers' services provided no cognizable value); *First Commer. Mgmt.*, 279 B.R. at 237 (finding services provided by innocent brokers in soliciting additional investors in Ponzi scheme provide value to the debtor in exchange for their commissions); *World Vision Entm't*, 275 B.R. at 658 (finding debtor received value in exchange for commissions paid to sales brokers for selling promissory notes); *Churchill Mortg.*, 256 B.R. at 680 (finding services provided by innocent brokers hired to produce mortgages and solicit investors without knowledge of Ponzi scheme gave value to the debtors in exchange for their commissions); *Universal Clearing House*, 60 B.R. at 1000 (finding services provided by innocent brokers provided value to the debtors and remanding to the bankruptcy court to determine issue of reasonable equivalence where bankruptcy court originally found that the brokers' services provided no cognizable value); *cf., Liberatore*, 278 B.R. at 584 (finding brokers provided reasonably equivalent value in exchange for commissions earned, even though the investment was ultimately found to be illegal and the debtor was required to disgorge the amount of the commissions to the Securities and Exchange Commission).

[202] *See, e.g., Warfield*, 436 F.3d at 553 and 560 (investors in Ponzi scheme alleged that they gave value to the debtors under section 548(c) by soliciting new investors in the Ponzi scheme); *Dicello*, 160 B.R. at 4 and 15 (investors in Ponzi scheme alleged that they provided services to the debtor by recruiting downline investors and that such services provided value in exchange for the amount received over the amount of their investment); *see also, In re Rodriguez)*, 209 B.R. at 429 (investor in Ponzi scheme alleged he had a verbal agreement with the Ponzi scheme operator entitling him to commissions for investments made by other investors).

[203] *Warfield*, 436 F.3d at 560 (relying on cases finding contracts to pay commissions for recruiting additional investors to be void on public policy grounds and stating that "it takes cheek" for the defendant to suggest that he gave value to the debtor by soliciting additional investors in the Ponzi scheme); *Dicello*, 160 B.R. at 15-16 (finding investors could not convert what was an unenforceable agreement to pay Ponzi scheme investors for their investments of cash and recruitment into a "services" contract but, even if such a contract did exist, it would be unenforceable on public policy grounds and, thus, did not provide value in exchange for the payments over the amount of the investors original investment); *In re Rodriguez*, 209 B.R. at 434 (finding defendant's verbal agreement with the Ponzi scheme debtor entitling him to commissions from the payments of other investors to be unenforceable as a matter of contract law and public policy and, consequently, that the debtors did not receive value in exchange for such commissions).)

their commissions by recruiting new investors into the scheme. Here, by contrast, Ruthven was a

third party vendor providing legitimate brokerage services for the acquisition of mineral

properties. Consequently, Ruthven's position is much more akin to the transferee in *Jimmy

Swaggart Ministries* who entered into a contract to sell real estate to the debtor engaged in the

Ponzi scheme.[204]   As the above cases indicate, if the payment of a securities broker's

commissions, even if earned by bringing new investors into the fraudulent scheme, may be

protected by section 548(c), then a third party vendor like Ruthven, who provided legitimate

brokerage services to Debtors on an arm's length basis, should also be entitled to the same

protection.

### d.     *Plaintiff's Cases on Value Are Both Inapposite*

74.     Plaintiff's Brief at page 24 cites only two (2) inapposite cases in relation to the

issue of value. The first, *Hensley v. Boudloche*,[205] involved a suit by a bankruptcy trustee to

avoid a partition. In determining whether the transfer was voidable as a fraudulent, the court

looks to certain "badges of fraud" one of which is whether the transferor received reasonably

equivalent value from the transferee in exchange for the transfer. In that instance, the value

given to the transferor is viewed from the transferor's side of the exchange, which is the same

basic standpoint as that of the creditors.[206] This is a logical construction of a statute designed to

protect creditors but has no application to the issue in this case of how value is viewed under

section 548(c).

75.     The second case, *Warfield v. Byron*,[207] involved a suit by an SEC receiver to

recover transfers made from the Ponzi scheme and applied Washington's fraudulent transfer

---

[204] 310 S.W.3d at 799.

[205] 201 F.3d 638, 644 (5th Cir. 2000).

[206] *Id.*

[207] 436 F.3d 551, 560 (5th Cir. 2006).

statute and the statutory defense available to a transferee who acted in good faith and gave

reasonably equivalent value.[208]  However, as the opinion notes, "It takes cheek [for the

transferee] to contend that in exchange for the payments he received, the RDI Ponzi scheme

benefited from his efforts to extend the fraud by securing new investments."[209]  This rationale

has no applicability to a third party vendor like Ruthven who, in a series of arm's length

transactions, provided legitimate brokerage services to the Debtors.

## C.    SUMMARY JUDGMENT ON THE ISSUE OF DAMAGES IS INAPPROPRIATE

76.    The purpose behind section 550(a) of the Bankruptcy Code is to restore the estate

to the financial condition it would have enjoyed if the transfer at issue had not occurred.[210]  If a

transfer is avoided, an estate representative is entitled to recover under section 550(a) the value

of the property transferred minus the consideration received from the transferee.[211]

77.    In the Motion, Plaintiff seeks summary judgment against Ruthven for

$48,812,882.24, the full amount of the Transfers.  However, the most that Plaintiff would be

entitled to recover from Ruthven under section 550 of the Bankruptcy Code is the difference

between the amount the Debtors paid Ruthven and the consideration the Debtors received from

---

[208] *Id.*

[209] *Id.*

[210] *Kingsley v. Wetzel (In re Kingsley)*, 518 F.3d 874, 877 (11th Cir. 2008) ("Bankruptcy courts have consistently held that 11 U.S.C. § 550 is designed to restore the estate to the financial condition that would have existed had the transfer never occurred." (citing *In re Sawran*, 359 B.R. 348, 354 (Bankr. S.D. Fla. 2007); *In re Centennial Textiles, Inc.*, 220 B.R. 165, 176 (Bankr. S.D.N.Y. 1998)) (internal quotations omitted)); *In re Classic Drywall, Inc.*, 127 B.R. 874, 876 (D. Kan. 1991); *In re Brown*, 118 B.R. 57, 60 (Bankr. N.D. Tex. 1990); *In re Blackburn*, 90 B.R. 569, 573 (Bankr. M.D. Ga. 1987).

[211] *See Asarco LLC v. Ams. Mining Corp.*, 404 B.R. 150, 176, 179 (S.D. Tex. 2009); *Hirsch v. Steinberg (In re Colonial Realty Co.)*, 226 B.R. 513, 525 (Bankr. D. Conn. 1998) ("Courts generally agree that the market value of the property at the time of transfer, less the consideration received, is the proper measure of recovery under § 550." (citing cases)).  *See also Clark v. Security Pac. Business Credit (In re Wes Dor, Inc.)*, 996 F.2d 237, 243 (10th Cir. 1993) (holding transferee of fraudulent transfer was "liable to the bankruptcy estate for the amount of the transfer less any value it extended to the Debtor in exchange for that transfer"); *Shape, Inc. v. Midwest Eng'g, Inc. (In re Shape, Inc.)*, 176 B.R. 1, 3 (Bankr. D. Maine 1994) (allowing the trustee to recover the difference between the value of the property on the transfer date less the consideration received by the debtor).

Ruthven.[212]  First, as discussed above, an issue exists as to whether Ruthven was even an initial transferee of the full extent of the Transfers.  Second, even if Ruthven is determined to be the Transferee, the only way Plaintiff could possibly be entitled to the damages he is seeking would be for the value of the mineral properties and Ruthven's brokerage services as of the date of the Transfers would have to be zero.  Plaintiff has presented no evidence regarding the value of Ruthven's brokerage services, and, as shown above, Ruthven's own summary judgment evidence indicates that its services were worth at least what the Debtors paid for them.[213]  Further, Plaintiff has presented no credible evidence regarding the value of the Assets as of the date of the Transfers.  The only evidence of value presented by Plaintiff is the expert report of L. Ford Clark ("Clark").  While Ruthven objects to the consideration of Clark's declaration as summary judgment evidence, even Clark concedes that that the Assets have a value greater than zero.[214]

78.    Therefore, even assuming *arguendo* that the Transfers are avoidable, Plaintiff has failed to satisfy his burden to demonstrate the amount of damages, if any, necessary to restore the Debtors' estate to the financial condition it would have enjoyed if the Transfers had not occurred.  Accordingly, Plaintiff is not entitled to summary judgment in the amount of $48,812,882.24 as requested in the Motion, and the Motion must be denied.

ACCORDINGLY, Ruthven prays that Plaintiff's Motion be in all respects denied and for all relief to which Ruthven may be entitled.

---

[212] *See Asarco LLC*, 404 B.R. at 173, 176; *Steinberg*, 226 B.R. at 525.

[213] Holland Aff., ¶¶ 17.h, 30.g, 36, 38 (Def. Appx. 1423, 1433, 1436-38); Barnhill Report, p. 6 (Def. Appx. 2789); Barnhill Dep. 118:10-25; 140:21-141:12 (Def. Appx. 2753, 2762-63).

[214] Plaint. Appx. pp. 924–25, 973, 975, 980–81.

Dated:  July 18, 2014                 Respectfully submitted,

/s/ Jeff P. Prostok
Jeff P. Prostok
State Bar No. 16352500
J. Robert Forshey
State Bar No. 07264200
Suzanne K. Rosen
State Bar No. 00798518
FORSHEY & PROSTOK, LLP
777 Main Street, Suite 1290
Fort Worth, Texas 76102
(817) 877-8855 Telephone
(817) 877-4151 Facsimile

-and-

John H. Carney
State Bar No. 03832200
JOHN H. CARNEY & ASSOCIATES
JCarnEy@johnHcarney.com
5005 Greenville Avenue, Suite 200
Dallas, Texas 75206
 (214) 368-8300 Telephone
 (214) 363-9979 Facsimile

ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document was served via ECF Electronic Notice, via first class mail, and via email on the parties listed below on this the 18th day of July, 2014.

J. Kenneth Johnson, II
Fleming, Nolen & Jez LLP
2800 Post Oak Blvd., Suite 4000
Houston, TX 77056
ken_johnson@fleming-law.com

Jerry C. Alexander
Passman & Jones PC
1201 Elm Street, Suite 2500
Dallas, TX 75270
alexanderj@passmanjones.com

Andrew B. Sommerman
Sommerman & Quesada
3811 Turtle Creek Blvd., Suite 1400
Dallas, TX 75219
asommerman@textrial.com

Michael R. Rochelle
Rochelle Hutcheson & McCullough
325 N. St. Paul St., Suite 4500
Dallas, TX 75201
buzz.rochelle@romclawyers.com

/s/ Jeff P. Prostok
Jeff P. Prostok

L:\JPROSTOK\Carney & Assoc. (Segner v Ruthven et al) #5698\11-03385-hdh ADV (Segner v. Ruthven)\Pleadings\Brief in Support of Response to Plaintiff's MSJ 7.18.14 Final.doc