

U.S. BANKRUPTCY COURT

NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK

THE DATE OF ENTRY IS

ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed September 11, 2014**

_____

**United States Bankruptcy Judge**

_____

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO. 09-33886** |
| **PROVIDENT ROYALTIES, LLC,** *et al.*, | § | |
| | § | **CHAPTER 11** |
| Debtors. | § | |
| | § | **(Jointly Administered)** |
| | § | |
| | § | |
| **MILO H. SEGNER, JR., as Liquidating** | § | **ADVERSARY NO. 11-03385-hdh** |
| **Trustee of the PR Liquidating Trust** | § | |
| | § | |
| Trustee, | § | |
| | § | |
| v. | § | |
| | § | **Hearing Held on August 21, 2014** |
| **RUTHVEN OIL & GAS, LLC,** | § | |
| **WENDELL HOLLAND,** | § | |
| **THE WENDELL AND KARI HOLLAND** | § | |
| **TRUST, and** | § | |
| **CIANNA RESOURCES, INC.,** | § | |
| | § | |
| Defendants. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

1

Trustee Milo H. Segner, Jr. (the "Trustee"), brought this adversary proceeding before the Court as the Liquidating Trustee of the PR Liquidating Trust, an entity formed in the above-captioned bankruptcy cases (the "Bankruptcy Cases") to collect and liquidate the assets of Provident Royalties, LLC ("Provident") and other jointly-administrated debtors as part of each of the debtors' confirmed Chapter 11 plans. In the Complaint, the Trustee seeks to avoid and recover certain transfers made to Defendants Ruthven Oil & Gas, LLC ("Ruthven"), Wendell Holland, the Wendell Holland and Kari Holland Trust, and Cianna Resources, Inc. (collectively, the "Defendants"). The Defendants moved for and were granted withdrawal of the reference to this Court,[1] but the District Court subsequently referred this adversary proceeding to this Court for the limited purpose of resolution of all pre-trial matters. On May 16, 2014, the Trustee moved for partial summary judgment with regard to certain of its claims against Ruthven [Docket No. 72] (the "Motion"), asserting that the evidence before the Court satisfies the Trustee's burden to prove the elements of a fraudulent transfer under 11 U.S.C. § 548(a)(1)(A). The Trustee also sought summary judgment as to Ruthven's affirmative defenses.

In its Order,[2] the Court granted the Trustee's Motion in part and denied the Motion in part. This Court found that no genuine issue of material fact existed as to whether transfers from the Provident to Ruthven totaling $48,812,882.24 were fraudulent transfers avoidable under 11 U.S.C. § 548(a). In other words, the Trustee has met his burden of proof on the elements required to avoid the Transfers. However, the Court also found that there were genuine issues of material fact as to Ruthven's "value and good faith" defenses under § 548(c). The Court enters these findings of fact and conclusions of law for consideration before the United States District Court for the Northern District of Texas at trial.

---

[1] Docket No. 70, entered on April 29, 2014.
[2] Docket No. 127, entered on August 27, 2014.

## I.     FACTUAL BACKGROUND

The debtors in the underlying jointly-administered bankruptcy cases include Provident, a Delaware LLC based in Dallas, Texas, along with numerous project entities Provident owned and marketed to investors as unregistered securities (together, the "Debtors").  Other than raising funds through the sale of stock in the project entities using private placement memoranda, the Debtors' principal business was to acquire mineral interests, working interests, and production payments from interests in real property located within the United States.  Competent summary judgment evidence was produced in the pleadings that the Debtors collectively raised over $485 million from investors over the period of 2004 through 2009.

One of the key principals who exercised control over the Debtors, Joseph Blimline ("Blimline"), was convicted in 2010 of securities fraud under 18 § U.S.C. 1341.  In his guilty plea, Blimline admitted to his role in defrauding investors.  Blimline confessed that he and others represented to investors that proceeds used by one project entity would not be used to pay dividends to investors in other project entities.  Blimline also confessed that this representation was false, and that investor funds in new projects were in fact used to pay dividends to investors in older project entities.

In addition to using the newly-raised capital to fund dividends to investors in other entities, the Debtors also acquired significant surface and mineral interests in real property, at one point owning over 290,000 acres in Oklahoma.  The Debtors, in acquiring such property, made use of the services of several brokers, including Ruthven, with whom the Debtors maintained a close relationship.  During the two years leading up to the bankruptcy filings, the Debtors transferred $48,812,882.24 to Ruthven (the "Transfers") as the broker to the acquisition of various mineral interests.  The amount of the Transfers and the fact that the Transfers occurred is admitted by the Defendants.

However – despite the significant acquisitions – little revenue was produced, and the revenue that was produced paled in comparison to the dividends paid out each year to investors. The investment and dividend scheme, in conjunction with mineral assets that did not produce revenues consistent with the scale of the investments, was not sustainable for the Debtors.  As a result of shortfalls in capital and mounting obligations, the Debtors came under investigation by the Financial Industry Regulatory Authority (FINRA) in the spring of 2009.  The Debtors each then filed petitions for bankruptcy protection on June 22, 2009 (the "Petition Date").

## II.    STANDARD FOR SUMMARY JUDGMENT

In the Motion, the Trustee seeks summary judgment on the basis that – considering the facts in the light most favorable to Ruthven and drawing all reasonable inferences in Ruthven's favor – there is no genuine dispute as to any material fact that the Trustee's claim of fraudulent transfer under § 548(a)(1)(A) has been established.  Pursuant to Rule 56 of the Federal Rules of Civil Procedure (as incorporated by Bankruptcy Rule 7056), this Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine dispute as to a material fact exists when, after considering the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, the Court "determines that the evidence is such that a reasonable jury could return a verdict for the party opposing the motion." *Haverda v. Hays Cnty.*, 723 F.3d 586, 591 (5th Cir. 2013) (citing *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 387 (5th Cir. 2007)).  An issue is material if its resolution could affect the outcome of the adversary proceeding.  *Wyatt v. Hunt Plywood Co., Inc.*, 297 F.3d 405, 409 (5th Cir. 2002).  A court "must consider all facts and evidence in the light most favorable to the nonmoving party, must draw all reasonable inferences in favor of the nonmoving party, and may not make credibility determinations or weigh the evidence." *Haverda*, 723 F.3d at 591.

4

### III.    COUNT ONE OF THE TRUSTEE'S COMPLAINT

The Trustee filed this adversary proceeding seeking recovery from several Defendants, but the Motion is limited to "Count One" of the Complaint (and solely with respect to Ruthven), which seeks to avoid and recover the Transfers to Ruthven by the Debtors.  The Trustee alleges that the Transfers were transfers of interests of the Debtors in property for which no consideration was given.  Furthermore, the Trustee asserts that the Debtors operated as a "Ponzi scheme," in which money from new investors was used to pay dividends to previous investors.  The Trustee asserts that pursuant to this scheme, the Transfers were made with the intent to hinder, delay, and defraud any entity to which the Debtors were or became indebted, as indicated by numerous badges of fraud, that the Debtors were insolvent at the time, and that the Debtors paid far in excess of fair market value for the mineral interests acquired in exchange for the Transfers, some worth nothing at all.  The Trustee further points to the fact that the Transfers occurred shortly after the Debtors incurred substantial debts and were orchestrated by Blimline, who, along with other principals of the Debtors, later pled guilty to the fraudulent scheme.  Ultimately, at least 11 persons pled guilty to schemes related to the Debtors.

Thus, the Trustee identifies the Transfers as avoidable fraudulent transfers and seeks to avoid such Transfers.  The Trustee contends that such badges of fraud surround the Transfers that Ruthven cannot possibly assert a "value" or "good faith" defense under 11 U.S.C. § 548(c).  The Court has considered the arguments, evidence, and pleadings of the Trustee, Ruthven, and other parties joining Ruthven in objecting to the Trustee's Motion, and is of the opinion that the Trustee should be granted summary judgment as to the determination that the Transfers are avoidable fraudulent transfers, but denied judgment as to Ruthven's "good faith" and "value" defenses, as genuine issues of material fact exist.

5

## IV.    AVOIDANCE OF TRANSFERS UNDER 11 U.S.C. § 548

Pursuant to 11 U.S.C. § 548(a)(1)(A), the Trustee can avoid the Transfers only by proving the following four elements: 1) a transfer; 2) of the Debtors' property; 3) that occurred within two years before the Petition Date; and 4) that the Debtors made with actual intent to hinder, delay, or defraud existing or future creditors of the Debtors.  *See* 11 U.S.C. § 548.  In the case before the Court, it is undisputed that the Transfers represented transfers of property of the Debtors to Ruthven and that the Transfers occurred within two years prior to the Petition Date.[3]  The remaining issue before the Court is whether the Transfers were made with "actual intent to hinder, delay, or defraud any entity to which the [Debtors were] or became . . . indebted."  § 548(a)(1)(A). If the Trustee successfully meets his burden on § 548(a), the burden then shifts to Ruthven to establish an affirmative defense.  As discussed below, this Court finds that the Trustee has successfully established that the elements of § 548(a)(1)(A) are satisfied.

Ruthven asserts, and the Trustee contests, that – even if the Transfers are avoidable under § 548(a) – it has affirmative defenses under § 548(c), which states:

> a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the Provident in exchange for such transfer or obligation.

This defense is often referred to by both the Trustee and Ruthven as the "Value and Good Faith Defense."  Pursuant to the Value and Good Faith Defense, Ruthven would be entitled to retain the Transfers to the extent that Ruthven gave value in good faith to the Debtors in exchange.  Genuine issues of material fact remain as to Ruthven's Value and Good Faith Defense.

---

[3] While the Trustee alleged in excess of $56 million of transfers in the Complaint, $48,812,882.24 is the total amount of the Transfers Ruthven has admitted to receiving from the Debtors both in its Admissions, as submitted by the Trustee [Appendix to the Motion, pp. 1084-1111], as well as in Ruthven's brief supporting its response to the Motion [Docket No. 98, p. 49, ¶ 77].

### a.  Actual Intent to Hinder Delay or Defraud

The Trustee, having met his burden with regard to all the other elements under §

548(a)(1)(A), must establish that the Debtors acted with actual intent to hinder, delay, or defraud

with regard to the Transfers.  Here, the Trustee alleges that such actual intent has been proven by

two lines of evidence: 1) guilty pleas admitting conduct fitting the Fifth Circuit's definition of a

Ponzi scheme; and 2) a detailed tracing of funds showing that a Ponzi scheme occurred.  The

Trustee offers the following as support:

1.  Shortly after the filing of the bankruptcy petition, the SEC brought a civil enforcement
    action in the Northern District of Texas (*SEC v. Provident Royalties, et al.*, Case No.
    3-09-cv-1238-L).  Pursuant to this action, the principals and the CEO of Provident had
    their assets frozen, and a receiver, Dennis J. Roossien, Jr. (the "Receiver"), was
    appointed for many of the Debtors as well as Provident Asset Management, LLC, a
    related company that served as Managing Dealer for the series of offers and sales
    involving the Debtors.

2.  In December of 2009, the SEC amended its complaint and obtained an asset freeze
    against the fourth principal of the Debtors.  Thirty-three remaining entities consisting
    of the Debtors were placed into receivership at this time.  Based on a review of the cash
    flow transactions among the Debtors, taking investment money raised for new project
    entities and paying dividends to older project entities, the Receiver determined that the
    Debtors and their principals were operating a Ponzi scheme.

3.  Blimline, in his Factual Statement,[4] admitted to being a "founder" and "key employee
    and consultant" to the Debtors and to acting in those capacities – along with Russell
    Melbye, the then-president of Provident, and others – to misrepresent the nature of how
    capital raised from investors would be used.  Among these misrepresentations was that
    investors' monies would not be used to pay dividends to investors in other project
    entities.

4.  Based on his review of the Debtors' accounts, the Receiver concluded that the Debtors
    were engaged in a Ponzi scheme.  The Receiver determined the Debtors were not
    profitable, individually or as a whole, and that tens of millions of dollars were siphoned
    out of later project entities to pay dividends to investors in earlier project entities.[5]

5.  In his Plea Agreement,[6] Joseph Blimline admitted,  along with five other co-
    conspirators,[7] to engaging in a related scheme from 2004-2007 in which new money

---

[4] Appendix to the Motion [Docket No. 74-2], pp. 000203-000205.
[5] *See* Declaration of Dennis L. Roossien, Jr., Appendix to the Motion [Docket No. 74-1], pp. 000067-000077.
[6] Appendix to the Motion [Docket No. 74-2], pp. 000190-000202
[7] *See* Appendix to the Motion [Docket No. 74-2], pp. 000394-000471.

was raised from investors to pay returns to earlier investors.  Mr. Blimline is currently serving time for engaging in this scheme.  These confessions included admissions that the related scheme was a "Ponzi scheme."

6.  On June 14, 2012, Paul R. Melbye, the CEO of Provident, admitted in his Factual Statement[8] that Provident defrauded investors, that Provident raised money from investors in new project entities to pay dividends to investors in older project entities, that Blimline was at all times a key player in this scheme despite representations otherwise, and that based on this scheme in excess of 6000 investors were defrauded out of over $485 million.

7.  The statements of Melbye and Blimline were corroborated by other founders, control persons, and officers of Provident.[9]

8.  Wendell Holland ("Holland"), a co-defendant in the adversary proceeding and the President of Ruthven, served as a member of the advisory board of one of the Debtors (Shale 3).  There is evidence of at least one transaction between Holland and Blimline extending back to 2004.  Furthermore, Holland acted as a contractual agent for Blimline on at least one occasion.

The Fifth Circuit Court of Appeal's 2011 opinion of *Janvey v. Alguire*, 647 F.3d 585 (5th Cir. 2011) lays out a Ponzi scheme as having the following characteristics:

A Ponzi scheme is a scheme whereby a corporation operates and continues to operate at a loss.  The corporation gives the appearance of being profitable by obtaining new investors and using those investments to pay for the high premiums promised to earlier investors.  The effect of such a scheme is to put the corporation farther and farther into debt by incurring more and more liability and to give the corporation the false appearance of profitability in order to obtain new investors.

647 F.3d at 597.  The Trustee urges the Court to find that the Debtors were operating a Ponzi scheme, and to follow the Fifth Circuit's 2006 opinion of *Warfield v. Byron*, 436 F.3d 551 (5th Cir. 2006) in finding that: once a Ponzi scheme is proved, intent to hinder, delay, or defraud is established under 11 U.S.C. § 548(a)(1)(A).

Ruthven argues that the Trustee's argument is misguided, that the Trustee is mischaracterizing the business of the Debtors, that the Debtors were not operating a Ponzi scheme

---

[8] Appendix to the Motion [Docket No. 74-4], pp. 000472-000477.
[9] Appendix to the Motion [Docket No. 74-4], pp. 000478-000488.

but a legitimate business that happened to have the misfortune of associating with Blimline, and that – even if a fraud were committed on some investors – the Trustee has not met his burden to show that the Transfers were made with actual intent to hinder, delay, or defraud creditors necessary to support a fraudulent transfer claim.  In its Brief, Ruthven relies on cases from outside the Fifth Circuit[10] for the statement that "[c]ourts have routinely rejected the notion that all payments from a Ponzi scheme, regardless of their nature, are subject to avoidance."  Finally, Ruthven attempts to draw a distinction between the Transfers and transfers made "in furtherance of" a Ponzi scheme, arguing in the alternative that – even if the Debtors were operating a Ponzi scheme – the Transfers were not *in furtherance of* the scheme.

This Court is not convinced by Ruthven's arguments.  The stipulations and confessions of the CEO, founders, principals and members of Provident and the other Debtors, who pled guilty and are serving time for their fraudulent actions, speak plainly of the Debtors' intentions with regard to their business operations.  These persons admitted to conspiring to and engaging in the fraudulent solicitation of new investors into new project entities so as to raise money to pay dividends to older investors in previous project entities.  The Receiver and the cash flows of the Debtors indicate that any revenues being generated were miniscule in comparison to the scope of the fundraising efforts and dividends being paid.  Each of the project entities was insolvent but for the regular influxes of new investor cash raised from newer project entities.  Finally, Ruthven's arguments that Blimline's acquaintance with the Debtors was merely incidental and unfortunate are not persuasive, as the CEO of Provident testified that Blimline was always a key player in the

---

[10] *Cuthill v. Greenmark, LLC (In re World Vision Entm't, Inc.)*, 275 B.R. 641, 658 (Bankr. M.D. Fla. 2002); *Balaber-Strauss v. Sixty-Five Brokers (In re Churchill Mortg. Inv. Corp.)*, 256 B.R. 664, 676 (Bankr. S.D.N.Y. 2000), *affirmed sub nom. Balaber-Strauss v. Lawrence*, 264 B.R. 303 (S.D.N.Y. 2001).

Debtors, exercised control over the Debtors, and was a major player, in conjunction with the other principals of the Debtors, in the securities fraud.

The Fifth Circuit has held that a Ponzi scheme is a "fraudulent investment scheme in which money contributed by later investors generates artificially high dividends or returns for the original investors, whose example attracts even larger investments." *Am. Cancer Soc. v. Cook*, 675 F.3d 524, 527 (5th Cir. 2012) (citing *Janvey*, 647 F.3d at 597, for the Black's Law Dictionary definition of "Ponzi scheme" (internal citation omitted)).  The Fifth Circuit has held that transfers from a Ponzi scheme are presumptively made with the intent to defraud, because a Ponzi scheme is, as a matter of law, insolvent from its inception.  *Cook*, 675 F.3d at 527 (citing *Warfield*, 436 F.3d at 558).  The Fifth Circuit has found sufficient evidence of a Ponzi scheme where there is the guilty plea of an officer of the company combined with a declaration of the company's receiver clearly showing the flow of money raised from new investors to pay dividends to old investors.  *See Janvey*, 647 F.3d at 596-600.  The identification of instances where monies were raised and then paid out to other investors is a key determinant as to whether a company operated as a Ponzi scheme.  *Cook*, 675 F.3d at 528.

The Fifth Circuit, in the case of *American Cancer Society v. Cook*, overturned a finding of a Ponzi scheme when there was a failure by the Trustee to show a single instance where investor funds were used to issue "returns" to other investors.  In contrast, the same court in the case of *Janvey* found a Ponzi scheme based on declarations provided by the receiver and a confession by the company's CFO that the company falsified its earnings to appeal to new investors.  The facts of the case at bar are unlike those present in *Cook*.  The Trustee has been careful to show numerous instances where funds raised from new investors were used to issue returns to investors in earlier, unprofitable projects.  In fact, the evidence presented here seems more substantial in favor of a Ponzi scheme than that presented to the court in *Janvey*. The Trustee presented not only the plea

of the Provident CFO, confessing that misrepresentations were made to investors, but the pleas of several other founders, key personnel, officers, and controlling parties who admitted not only to defrauding investors but to doing so for the express purpose of paying dividends to existing investors in other projects.  The Trustee also presented extensive evidence, as provided in the Receiver's Declaration in support of the Motion[11], showing the detailed cash flows of funds raised from new investors and transferred as dividends to old investors, at rates of return and in amounts that exceeded the revenues generated.

Based on the extensive evidence delineated above, which was not effectively rebutted by Ruthven, and the precedent set forth by the Fifth Circuit, this Court finds that the Debtors operated as a Ponzi scheme.  Therefore, the presumption arises that the Transfers to Ruthven were made with actual intent to hinder, delay, and defraud creditors.  Consequently, the Trustee has met his burden and established that the Transfers were fraudulent transfers avoidable pursuant to § 548(a)(1)(A) of the Bankruptcy Code, subject to any defenses retained by Ruthven.  Thus, on this point the Court issues summary judgment in favor of the Trustee.

## V.      RUTHVEN'S DEFENSES UNDER 11 U.S.C. § 548(c)

Having determined that the Transfers are avoidable pursuant to 11 U.S.C. § 548(a)(1)(A), the Court next turns to whether the Trustee is entitled to summary judgment as to Ruthven's defenses under § 548(c).  Under this section, a transferee of a fraudulent transfer avoidable under subsection (a) may retain any interest transferred to the extent that it was taken in good faith and in exchange for value given to the debtor.  The Trustee points to the relationship between Holland, Ruthven's principal, and Blimline as the basis for summary judgment that Ruthven did not act in good faith.  The Trustee asserts that (a) Ruthven, through Holland, was aware of the Ponzi scheme;

---

[11] Declaration of Dennis L. Roossien, Jr., Appendix to the Motion [Docket No. 74-1], pp. 000067-000077.

(b) alternatively, Holland intentionally disregarded the fact that the Debtors operated as a Ponzi scheme, since it made lucrative profits on each transaction; and (c) additionally or alternatively, Holland was an insider of the Debtors, serving on the Board of Advisors of Shale Royalties 3, one of the many Debtors. Ruthven, in turn, insists that Holland's relationship with Blimline was limited to mere acquaintance, having transacted a couple of times together over several years. In support of this argument, Ruthven provides Holland's Declaration,[12] which states that – despite his being on the advisory board for one of the Debtors – Holland never participated in nor was aware of anything inappropriate. On the contrary, Ruthven argues: Holland served merely in a token capacity to maintain good relations with one of Ruthven's most important customers. Ruthven then asserts that all transactions between it and the Debtors occurred at arms' length and Ruthven had absolutely no reason to know or believe that anything inappropriate was occurring. Finally, Ruthven contests the argument by the Trustee that it should have been aware of the fraudulent nature of the transactions due to the lopsided compensation it received, arguing that its rates were either in line with or lower than rates it charged other clients and the rates charged by other brokers for comparable services.

Alternatively, the Trustee seeks summary judgment on the grounds that the Transfers paid to Ruthven were not "for value." At the core of the Trustee's argument is that Ruthven failed to show that the properties it brokered and that were conveyed to the Debtors in exchange for the Transfers provided any value to the estate. The Trustee alleges that the property conveyed by Ruthven included worthless interests in land, such as mineral interests in real property where dry holes had already been drilled. Ruthven, on the other hand, argues that the property is not the value at issue, but rather the value of the services it provided to the Debtors. Ruthven points to

---

[12] Affidavit of Wendell Patrick Holland, Appendix to Ruthven's Response [Docket No. 99-20].

the fact that the Debtors identified the mineral prospects they wanted to purchase and Ruthven merely provided the brokerage services necessary to acquire them.  Specifically, Ruthven asserts that the Debtors undertook all the duties of due diligence to analyze and evaluate the mineral prospects, and then instructed Ruthven as to how much they were willing to pay for each interest. Ruthven argues that value, as best understood from its side of the transaction, was certainly conferred upon the Debtors through Ruthven's services, which helped the Debtors acquire the particular interests they sought to acquire.  Ruthven points to the fact that the Trustee has failed to demonstrate how Ruthven's brokerage services failed in that capacity.   Additionally, Ruthven asserts that "value" was provided to the Debtors because the Debtors obligated themselves to pay contractual fees for the services provided, meeting the definition of "value" under 11 U.S.C. § 548(d)(2)(A).  Ruthven finally argues that, even if its brokerage services were used in furtherance of the Ponzi scheme, the services provided still constitute value pursuant to § 548(c).

### Ruthven's Burden of Proof as to its Defenses

As the transferee, Ruthven has the burden of proof on its defense.  *Jimmy Swaggart Ministries v. Hayes (In re Hannover Corp.)*, 310 F.3d 796, 799 (5th Cir. 2002).  To prevent summary judgment, Ruthven must demonstrate that genuine issues of material fact exist regarding 1) whether Ruthven received the Transfers in good faith and 2) whether Ruthven gave value in return.  Furthermore, all evidence must be considered in favor of the non-movant, and where the Court determines any genuine issue of material fact exists, the Trustee's Motion must fail so as to give the finder of fact the opportunity to make a determination.

### The Good Faith Defense

As mentioned above, § 548(c) provides transferees a defense against a trustee's successful demonstration of a fraudulent transfer when the transferee took for value and in good faith.  While good faith in this context is not well-defined, the Fifth Circuit Court of Appeals found in *Swaggart*

13

that the most important question concerns the transferee's state of mind and awareness of the transferor's intentions.[13] Good faith is determined by looking at what the transferee objectively knew or should have known instead of examining the transferee's actual knowledge from a subjective standpoint. *Warfield*, 436 F.3d at 560.

The Court notes that the Trustee presents very little actual evidence indicating Holland's or Ruthven's awareness of any fraudulent act by the Debtors at the time of the Transfers. Much of the Trustee's allegations are circumstantial, indicating that Holland should have investigated Blimline due to certain "clues" along the way. Finally, the Trustee offers as argument the fact that Ruthven conveniently lost certain records, which may have relevance but is not, alone, sufficient to find an absence of good faith. On the other hand, Ruthven argues thoroughly that it operated in good faith at all times. Ruthven characterizes its relationship and actions taken with regard to the Debtors as simply a broker of mineral interests, trying to satisfy a customer that had specific wants and needs.

In support of this characterization, Ruthven points to the arms' length nature of the transactions, the fact that the Debtors employed other, legitimate brokers to acquire mineral interests on their behalf, that Ruthven's compensation was negotiated down by the Debtors based on the volume of the transactions, that there is no affiliation between Ruthven and the Debtors, and finally, due to the nature of the services provided, that Ruthven was not under any duty to investigate the Debtors in order to provide its services. Considering the facts in the light most favorable to Ruthven, the Court finds that genuine issues of material fact exist as to whether Ruthven took the Transfers in good faith. While there may be some question as to the veracity of

---

[13] *See Swaggart*, 310 F.3d at 800.

its claims, whether Ruthven's relationship to the Debtors was anything other than that of a normal broker is one for the finder of fact.

*The Value Defense*

As described above, the Trustee and Ruthven disagree as to whether the value conferred by Ruthven in exchange for the Transfers should be viewed from the standpoint of the creditors or of the Transferee. The Fifth Circuit has held that the primary consideration in analyzing the exchange of value for any transfer is the degree to which the transferor's net worth is preserved. *Warfield*, 436 F.3d at 560. As the transferee of the Transfers, Ruthven incorrectly asserts that the standard for determining value is the value Ruthven conferred from its perspective. However, Ruthven correctly notes that value is defined by § 548(d)(2)(A) to include the "satisfaction . . . of a present or antecedent debt of the debtor." The Debtors obligated themselves to pay Ruthven by seeking out Ruthven's services and seeking to acquire the mineral interests. Thus, Ruthven provided some value to the Debtors, but the amount of the value must be viewed in terms of how the Debtors' estates were benefited. Regardless, Ruthven has met its burden to present some evidence that it provided value in exchange for the Transfers.

## VI. CONCLUSION

The Trustee has established all of the elements under 11 U.S.C. § 548(a)(1)(A) with regard to the Transfers made to Ruthven by the Debtors. The Debtors operated as a Ponzi scheme, thus creating a presumption that all transfers were made with actual intent to hinder, delay, and defraud existing and future creditors. However, Ruthven has met its burden to establish that some question exists as to whether it received the Transfers in good faith and that it provided some value in exchange. Such genuine issues of material fact must be taken up before the finder of fact in the District Court.

###End of Findings of Fact and Conclusions of Law###